**Douglas Joseph HODGES and Vernon Clyatt, Rewis, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 16171.**

United States Court of Appeals
Fifth Circuit.

April 12, 1957.

---

282

A. M. Crabtree, Jr., John W. Muskoff, Jacksonville, Fla., for appellants.

E. Coleman Madsen, Asst. U. S. Atty., Jacksonville, Fla., James L. Guilmartin, U. S. Atty., Miami, Fla., for appellee.

Before TUTTLE, JONES and JOHN R. BROWN, Circuit Judge.

BROWN, Circuit Judge.

Hodges and Rewis were jointly indicted, tried and convicted under 26 U. S.C.A. §§ 5174, 5606, 5216, and 5008 for illegal possession of distilling apparatus, carrying on the business of a distillery without bond, fermenting mash, and possession of distilled spirits. Each appeals by separate counsel.

Caught red-handed in the raid of January 12, 1955, on his own property from which he could not escape with a 500-gallon still, 4500 gallons of mash, and 230 gallons of nontaxpaid liquor, the only point of substance as to Rewis concerns the search warrant under which the raid took place. As to Hodges, whose presence and participation may have been more equivocal and whose sudden flight ended by running into a wire fence, the disposition of his appeal is for procedural matters. Hence we find it unnecessary to add to the ever expanding literature of the law another recital of the familiar details in moonshine operations and the ceaseless efforts to stamp it out.

Rewis contends that the search warrant issued January 12, 1955, the day of the raid was illegal because it was based on information obtained the night before, January 11, 1955, by an Agent then unlawfully within his curtilage without a warrant. On a pre-trial hearing the District Court, after full evidence, denied the motion to suppress the fruits of the raid and held the warrant valid.

On both nights the still was set up and operating in a chicken house. It was within the 12-acre tract generally fenced in, west of River Road and which, with 68 acres east of the road, formed Rewis' 80-acre farm. All dwelling and farm buildings were on the 12-acre tract. The house, shed, garage and milking barn were within a separate fenced enclosure. Three other chicken houses and a hog pen were in two enclosures north and west of the house. Approximately 100 feet south of the dwelling enclosure fence was an area about 240 feet in length, east and west, by 95 feet in width north and south, completely surrounded by a wire fence. Cutting this area in two parts was a further north-south fence about 100 feet from the west side. It was in the east portion of this area that the chicken house used as a distillery was located. West of the chicken-still house area, Rewis' 12 acres extended for about 382 feet to his western boundary fence. The chicken-still house area was about 200 feet north of Rewis' fenced boundary line on the south.

The chicken-still house was thus 150 feet from the home, separated from it by two fences, as it was from the large pasture area on the west.

On the night of January 11, the Agent stealthfully made his way along the south boundary fence, crossed it at the southwest corner, then crossed the west boundary fence to a position in the pasture area about 225 feet due west of the chicken house. There were thus two fences between him and the chicken house as he made his surveillance. From this vantage point, by use of binoculars, he had an unobstructed view of the activities within the chicken house, the south end of which was substantially open. What he saw and smelled was more than enough for a prudent person to conclude that moonshining was taking place. Clay v. United States, 5 Cir., 239 F.2d 196, 201–202; McBride v. United States, 5 Cir., 284 F. 416, certiorari de-

283 U.S. 614, 43 S.Ct. 359, 67 L.Ed. 827.

As we have recently restated, what is curtilage is a question of fact, since what is intended to be included are the buildings comprising the immediate domestic establishment and which are thus the buildings "constituting an integral part of that group of structures making up the farm home," Walker v. United States, 5 Cir., 225 F.2d 447, at page 449. We have no doubt, however, that neither the chicken house, the enclosed area in which it was situated, the enclosure immediately to the west of it, nor the large pasture area in which the Agent was stationed for his vigil was curtilage. These were too removed in distance and too definitively set apart by fixed fences from the farm home to be a part of it.

 There was no invasion of home or its immediate appurtenances forming the curtilage. At most it was a trespass in an open field which affords Rewis no aid or comfort since "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to open fields * * *" and "It is obvious that even if there had been a trespass, the * * * testimony was not obtained by an illegal search or seizure," Holmes, J., Hester v. United States, 265 U.S. 57, 58, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898, 900.

The search warrant was valid, issued on legal and probable cause. It is nonetheless so because, on this conclusion, the Agent might lawfully have made the raid on what he then saw and knew. Hasty action with the officer substituting his judgment for that of the impartial magistrate, Johnson v. United States, 333 U.S. 10, 13, 14, 68 S.Ct. 367, 92 L.Ed. 436, 440, would most assuredly have precipitated a complaint by Rewis and his henchmen that such arrest and search was illegal for want of a warrant. Neither principle nor the orderly administration of justice would justify our striking down a valid warrant merely because bolder action might have been taken.

██ As to Hodges, we are of the opinion that the judgment must be reversed for a new trial because we are unable to satisfy ourselves on this record that substantial harm was not done, Lovely v. United States, 4 Cir., 169 F.2d 386, cf. United States v. Titus, 2 Cir., 221 F.2d 571, certiorari denied 350 U.S. 832, 76 S.Ct. 66, 100 L.Ed. 742; United States v. Hall, 2 Cir., 200 F.2d 957, when the Court required Hodges' counsel to state his objections to the Court's charge in the presence of the jury. The rule, Fed. Rules Crim.Proc., rule 30, 18 U.S.C.A. is plain and imperative:

"* * * No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."

It is also a wholesome rule bottomed on good sense which ought not to be weakened by tacit approval of breaches under a too easy application of the rule on harmless error, Fed.R.Crim.P. 52 (a). Promulgated presumably because the administration of criminal justice demonstrates that substantial and irretrievable harm can come if persons charged with crimes and their counsel are compelled in the presence of the jury to engage in what to untrained laymen may appear to be criticism and condemnation of the Court or the judge presiding over it, the avoidance of that harm can best be assured by genuine adherence to the spirit and practice of the rule. Where the breach is not technical, momentary or inadvertent, and the record indicates that the defendant has as best he might in the awkward embarrassment of the situation registered opposition to such proceeding, that there may be no affirmative, actual demonstration of harm does not relieve the reviewing court from most careful appraisal.

In such a process of evaluation the circumstances of this record engender a considerable doubt. Oddly enough the matter was precipitated by the trial judge himself, for answering his own query to counsel, "Well, do you want to make it [objection to the Court's charge] in the presence of the Jury or out of the presence of the Jury?", the Court, after counsel affirmatively assented, replied, "I don't quite agree with you, but the jury can retire." But the jury did not retire nor was it permitted to. Instead, an extended colloquy in the jury's presence occurred ending several minutes (and pages) later by counsel again asking, "Well I have to make my objection before the jury?", to which, as part ruling and part instruction to the listening jury, the Court stated, "Oh yes. Now, gentlemen, that's the case."

And this episode cannot be isolated from developments of a whole trial then approaching its decisive climax. The jury had heard the Court characterize one of this counsel's questions on vital cross examination as "silly," issue a warning to him "* * * not [to] try to frustrate the trial" and for him "to keep * * * within reason on these motions", otherwise the Court would "have to shut down on you" and order this counsel, after counsel himself voluntarily brought the matter to the Court's attention, to be sworn and take the witness stand to state the facts concerning the inadvertent presence of a witness in the court room contrary to the rule.

These actions, whether proper or improper at the moment, have significant relevance in breathing into remarks literally accurate but misleading to untrained laymen a connotation open to the jury that the Court considered criminal lawyers, and hence the client they defend, in a most unfavorable light. In the colloquy the judge made a statement concerning aiders and abettors to which defense counsel remarked, "I have a little different idea." To this the Court spontaneously replied, "I know you do. I think most criminal lawyers do disagree with what the judges think * * *."

Of course we know, as did all counsel, that far from impugning the motives or integrity of criminal lawyers or this counsel, the statement by this able and experienced trial judge was really a genuine homely tribute to Anglo-American advocacy for he was quick to add: "That's their business and it is perfectly legitimate. You have a right to your view. I am not saying that you don't."

But the question is not its inherent accuracy or the effect on judges or lawyers. To laymen comprising the jury in this total setting, it may well have been considered as a disparagement, not only of criminal lawyers generally, but this particular one.

Since the case must be reversed for this error, we do not pass upon those which are likely not to reoccur on another trial, and the balance of the objections are found to be without merit.

Accordingly, the judgment of conviction is affirmed as to the appellant Vernon Clyatt Rewis but reversed and remanded for a new trial as to Douglas Joseph Hodges.

Affirmed in part and reversed and remanded in part.