**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Otis WILLIAMS, Defendant-Appellant.**

**No. 77–5538.**

United States Court of Appeals,
Fifth Circuit.

Oct. 3, 1978.

---

Tommy Rayburn, Oxford, Miss. (Court Appointed), for defendant-appellant.

H. M. Ray, U. S. Atty., Alfred E. Moreton, III, Sam Knowlton, Asst. U. S. Attys., Oxford, Miss., for plaintiff-appellee.

Before COLEMAN, GEE and HILL, Circuit Judges.

GEE, Circuit Judge:

Appellant Williams was convicted of possessing and operating an unregistered still and of possessing five gallons of moonshine whiskey. He appeals on fourth amendment grounds, contending that the still was located as a result of an illegal search conducted by federal agents from the Bureau of Alcohol, Tobacco and Firearms (ATF). We disagree and affirm the convictions.

Federal Agent Harry Braxton received a tip from an undisclosed source that a still was being operated on Hyrun Crutcher's property in Marshall County, Mississippi.[1]

---

1. The government admits that this tip did not constitute probable cause for a search of Crutcher's land.

Acting on this information, Braxton and one other ATF agent, Charles Mosley, drove by the suspected location of the still but could see nothing from the public highway. Later the same evening the agents returned. This time they left their car at a nearby church and stole southward through a wooded area toward the outbuildings of the Crutcher farmstead situated some fifty yards north of and behind the Crutcher residence, which faced south. Still unable to detect any evidence of a still, they crawled across a clearing and took cover behind an overturned truck adjacent to the northeast corner of a dilapidated fence. This fence formed a square hogpen by connecting with two sheds at its northwest and southwest corners. From their position behind the wrecked truck, the agents detected the odor of moonshine liquor and fermented mash coming from the direction of the hogpen. Mosley then crept down the east side of the fence until he could see the open area of about fifty yards between the pen and two houses, one of which belonged to Crutcher and the other to Crutcher's daughter. Here he noted a garden hose running from a faucet in Crutcher's yard toward the larger of the two sheds, which stood at the southwest corner of the fence. He could not determine whether the hose actually entered the shed. He then retraced his steps, and both agents crossed over the fence at a place where it had been walked down almost to the ground. As they approached the rear wall of the larger shed, the increasing strength of the tell-tale odors identified it as their source.

Armed with the information obtained in this investigation, the agents prepared an affidavit and procured a search warrant for Crutcher's property. When they executed the warrant, both Crutcher and appellant Williams were arrested on the premises, the latter carrying three one-gallon jugs of moonshine. Crutcher later pleaded guilty, while Williams unsuccessfully maintained his innocence.[2]

■ Since *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the applicability of the fourth amendment has been said to depend upon the existence of a "reasonable expectation of privacy." 389 U.S. at 360, 88 S.Ct. 507 (Harlan, J., concurring). Although the expectations test has done away with outmoded property concepts no longer satisfactory for fourth amendment analysis, *see The Supreme Court, 1967 Term,* 82 Harv.L.Rev. 63, 189 (1968), the distinction between open fields and curtilage is still helpful in determining the existence or not of reasonable privacy expectations. *See generally* Note, 76 Mich. L.Rev. 154, 177–79 (1977). We have held that open fields surrounding a house are not protected under the fourth amendment and that a search of them need not be accompanied by a warrant issued upon probable cause. *See, e. g., United States v. Brown,* 473 F.2d 952, 954 (5th Cir. 1973); *Atwell v. United States,* 414 F.2d 136, 138 (5th Cir. 1969); *Hodges v. United States,* 243 F.2d 281, 283 (5th Cir. 1957). As to curtilage, however, the "home [and] its immediate appurtenances," *Hodges v. United States,* 243 F.2d at 283, we have held that warrantless searches are improper absent exigent circumstances, at least when the investigating officers have intruded upon the curtilage for the purpose of conducting a search for criminal activity. *See United States v. Davis,* 423 F.2d 974, 976–77 (5th Cir.), *cert. denied,* 400 U.S. 836, 91 S.Ct. 74, 27 L.Ed.2d 69 (1970). *Cf. United States v. Knight,* 451 F.2d 275, 278–79 (5th Cir. 1971), *cert. denied sub nom. Grubbs v. United States,* 405 U.S. 965, 92 S.Ct. 1171, 31 L.Ed.2d 240 (1972) (upholding the admission of evidence discovered in "plain view" while officers were legitimately within the curtilage for another purpose).

■ Our prior case law forces us to conclude that the still shed in this case was within the curtilage of the dwelling occupied by Hyrum Crutcher's daughter. While this shed was approximately fifty yards

---

**2.** Although the still shed rested on property owned by neither Williams nor Crutcher, but by Crutcher's daughter, the government unaccountably concedes standing, and that issue is not before us.

from the house, we held in *Walker v. United States,* 225 F.2d 447 (5th Cir. 1955), that curtilage included a barn seventy to eighty yards from the principal dwelling. More important, as in *Walker,* the Crutcher shed was "a domestic building constituting an integral part of that group of structures making up the farm home," 225 F.2d at 449, because it was not separated from the house by any fence, outbuilding, or great expanse of open land. *See Hodges v. United States,* 243 F.2d at 283.

■ The fact that the shed itself is within the curtilage is not necessarily dispositive, however, since the agents never actually entered the shed. This circumstance forces us to attempt to draw a rational line between the curtilage and the "open fields." Clearly, if the agents had gone no farther than the wrecked truck we would have upheld the search under the "open fields" doctrine, since the wreck was no part of the farmstead and merely defined a point in those fields. Nor do we think that the dilapidated hogpen fence, stepped over by the agents on their foray to the back wall of the shed, defines the curtilage. In the past we have not considered the crossing of a fence significant unless the fenced area included the house. *See, e. g., Brock v. United States,* 256 F.2d 55 (5th Cir. 1958); *Hodges v. United States,* 243 F.2d 281 (5th Cir. 1957). Here the broken-down fence the agents crossed did not encompass the house but was a mere appurtenance of the shed.

The fence in question here was not a privacy fence or an exclusionary one; in its best days, it was meant to do no more than keep the hogs in, not to keep anyone out. In its condition when the agents stepped over it, it offered little, if any, impediment either to vision or to ingress. In view of these considerations, we think that the fence was not such as to create either any reasonable expectation of added privacy or to either join the still shed to or separate it from the residences. We therefore conclude that, whatever minor practical significance it may have retained for the hogs, it has no legal significance for us.

In legal contemplation, therefore, the case is to be viewed as though the agents had merely approached the back wall of an extreme outbuilding across open fields. Our prior case law affords us no guidance in determining the extent of the curtilage beyond the most remote building in the curtilage in the absence of a fence that encompasses the house. *United States v. Holmes,* 521 F.2d 859, 869 (5th Cir. 1975), *aff'd by an equally divided court,* 537 F.2d 227 (5th Cir. 1976) (en banc), seems squarely on point, but it is not binding on this issue. Although the majority of the court en banc purported to adopt the panel's discussion entitled "The Search of the Shed," the panel's holding has no precedential value because the court was equally divided on this issue. Neither is *United States v. Davis, supra,* applicable, because the agents in this case were prowling around an outbuilding, not a house.

■ Three possible ways of defining the curtilage suggest themselves: drawing the line an arbitrary distance from the most remote outbuilding in the curtilage, holding that the curtilage includes a "reasonable zone" beyond the most remote outbuilding in the curtilage, or holding that the outer walls of the extreme outbuildings of the curtilage define the outer limits of the curtilage. Rejecting an arbitrary distance as being irrational and a "reasonable zone" as being too vague for guidance, we hold that, as to outbuildings that are not encompassed by a fence that also includes the house, or perhaps a privacy or exclusionary one around them, the outer limits of the curtilage are defined by the walls of the remote outbuildings. Certainly such buildings give an added expectation of privacy for their contents, but we see none as to the area outside and beyond them.

■ Because the agents in this case did not intrude upon the curtilage so defined but merely detected the odor of mash while standing outside the curtilage, their furtive trespass, though carried to the very verge of propriety, does not render the search warrant invalid. *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898

(1924); *Fulbright v. United States,* 392 F.2d 432 (10th Cir.), *cert. denied,* 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1968).

Accordingly, the judgment below is AFFIRMED.