UNITED STATES of America,
Plaintiff-Appellee,

v.

Ronald Dale DUNN and Robert Lyle Carpenter, Defendants-Appellants.

No. 81–1200.

United States Court of Appeals,
Fifth Circuit.

May 7, 1982.

Rehearing Denied June 28, 1982.

---

Louis Dugas, Jr., Orange, Tex., for Dunn.

Stephen Shelnutt, Houston, Tex., for Carpenter.

Robert Lyle Carpenter, pro se.

Sidney Powell, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, POLITZ and TATE, Circuit Judges.

POLITZ, Circuit Judge:

Ronald Dale Dunn and Robert Lyle Carpenter were found guilty by a jury of conspiring to manufacture phenylacetone and amphetamine, and to possess amphetamine with intent to distribute, in violation of 21 U.S.C. § 846. Dunn also was convicted for manufacturing the two controlled substances and for possessing amphetamine with intent to distribute. 21 U.S.C. § 841(a)(1). The jury convicted Carpenter of aiding and abetting Dunn in the unlawful manufacturing and possessing. 18 U.S.C. § 2.

Carpenter challenges the sufficiency of the evidence supporting his convictions, particularly that which ties him to Dunn's activities. We are not persuaded; Carpenter's convictions are affirmed. Dunn appeals the trial court's refusal to suppress physical evidence, obtained as a result of warrantless searches of his ranch near Johnson City, Texas, and certain statements he made after arrest. Finding merit in this assignment of error, we reverse and remand.

*Background Facts*

A careful marshalling of the facts usually is required for appellate review for few, if any, legal questions may be resolved in a factual vacuum. Detailing of facts is particularly critical in cases in which the controlling precedent is less than precise and the perceived distinguishing features are less than overwhelming. The case before us belongs in that category, for in its resolution we are propelled into the amorphous realm of constitutional discussion subtitled "reasonable expectations of privacy." Our task in this context is to separate that which falls within the aegis of this fourth amendment buckler from that which does not. *See, e.g., Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 587 (1967) (Harlan, J., concurring).

The factual scenario began in the summer of 1980 with the surveillance of Carpenter, in and around the Houston, Texas area, by agents of the Drug Enforcement Administration (DEA). Carpenter was accumulating large quantities of chemicals and equipment used in the manufacture of controlled substances, particularly amphetamine and phenylacetone. Some of the purchases were made in his name, some were made in the name of Omega, Inc., a corporation of which he was president, and some

were made under the alias "Jack Carter." The equipment acquired included several hot plate stirrers.

A hot plate stirrer is an electric heating device that applies heat to a container and, by use of a built-in magnet, stirs the contents. Stirrers are used in the "cooking" of chemicals.

When Carpenter placed his order for stirrers, DEA Agent Robert Surovec secured a warrant from a Texas state judge authorizing the installation and operation of an electronic beeper in a stirrer. The beeper was installed and activated. Thereafter, on September 3, 1980, Carpenter took possession of the rigged stirrer and was tracked to his residence in Spring, Texas. A few days later the signal from this beeper was lost, to be re-discovered in early November 1980, on Dunn's ranch in Blanco County, Texas.

In the meantime, DEA Agent Ronald Gospodarek secured the installation of a beeper in a 55 gallon plastic drum which was to be used to deliver acetic anhydride ordered by Carpenter. Simultaneously, plans were completed to install a beeper in a container filled with 100 pounds of phenylacetic acid, a precursor to phenylacetone, which Carpenter had ordered. Warrant authorization was granted by state authorities. Thereafter, the drum and container, laden with the chemicals and beepers, were delivered to Carpenter.

The drum and container beepers were monitored from October 27, 1980 until November 5, 1980. On the latter date, Gospodarek and other officers, homing on the container beeper, trailed Carpenter, driving a pickup truck, from Houston to Ronald and Betty Dunn's ranch near Johnson City, Texas. Aerial surveillance disclosed the truck backed up to a barn behind the ranch residence, apparently for the unloading of its contents. It was at this time that the hot plate stirrer beeper, lost in early Septem-

ber, was detected. It, too, was on the ranch property.

On the afternoon of November 5, 1980, DEA agents took aerial photographs of the ranch. The photographs showed a ranch house set back approximately ½ mile from a public road, at the end of a private driveway, a smaller house immediately next to the main residence, a windmill, a water tank, and two barns approximately 50 yards behind the house. The residence enclave was surrounded by trees and the ranch acreage was circled by a perimeter fence. There were several interior fences near the buildings and at other locations. The private driveway was secured by a locked chain.

Around 9:00 p. m. on the night of November 5, 1980, after studying the photographs, Gospodarek and Officer Martin Fite of the Houston Police Department crossed the perimeter fence and approached the confines containing the buildings. They became disoriented in the dark but eventually came to the driveway leading to the residence. They went to a fence at the rear of the ranch house and there detected a strong odor of phenylacetic acid.[1] Crossing another fence, they looked into one pole barn and saw only empty boxes. Then they walked under the tin overhang of the second barn, up to a closed gateway. With the aid of their flashlights, they looked through the barn's openings and noted its contents. They saw chemicals and chemical equipment in a setting taken to be a phenylacetone laboratory.

 Their mission completed, Gospodarek and Fite withdrew. Shortly afterwards, Gospodarek telephoned Surovec and reported the findings. Adding this information to that already in hand, Surovec began preparing an affidavit for a warrant to search the ranch.[2] The drafting was completed on November 6, 1980.

---

1. Gospodarek initially testified at the suppression hearing that he was unaware that he was on Dunn's property when he first noted the odor of phenylacetic acid. That he was on Dunn's ranch, however, is established beyond

doubt by his further testimony and the other evidence. *See* note 2, *infra*.

2. Surovec's affidavit stated:

At about 10:55 p. m., on November 5, 1980, Agent Gospodarek telephonically advised me

On two occasions on November 6, 1980, officers made entry into the ranch and inspected the buildings. In the early afternoon, Gospodarek, accompanied by DEA Agent Fred Thomas, returned to see in daylight what had been observed by flashlight. They had no warrant authorization, although Agent Surovec was in the process of preparing the supporting affidavit. While on the property, they installed one electronic surveillance device on the private drive, just off the public road, and another on the gate of the barn housing the laboratory. The devices were placed on Dunn's property without prior warrant authorization.[3]

At approximately 6:00 p. m. that same day, Surovec completed preparation of the warrant affidavit and, accompanied by DEA chemist Buddy Goldston and DEA technician Wayne Moody, he presented the warrant request to a federal magistrate. A warrant to search the Dunn ranch was issued at 8:30 p. m. on the night of November 6, 1980.

> that he and Houston Police Officer Martin Fite had walked down a fence line south of the farm which separates Dunn's property from adjacent property. At this time, Agent Gospodarek related to me that he and Officer Fite had smelled a strong chemical odor which indicated to Agent Gospodarek that phenylacetone was being manufactured. Agent Gospodarek and Officer Fite then crossed over the fence and approached the barn-like structure at the rear of the house and at this time observed, with the use of flashlights, that one side of the barn was open and that inside the barn there were three large flasks in a refluxing stage.

Surovec's affidavit continued:

> On the evening of November 5, 1980, Agent Gospodarek telephonically advised me that he had determined through the Blanco Courthouse and through Game Warden Warren Guthrie that the farm consisted of 198.1 acres and had been purchased by Ronald D. Dunn in February 1980.

It is clear from testimony at the suppression hearing that the affidavit contains several misstatements. Although the errors are apparent, the warrant issued on the evening of November 6, 1980 is not invalid for this reason. "Under the holdings in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and

While Surovec was requesting the warrant from the magistrate, Gospodarek, accompanied by other agents, again made entry. Gospodarek looked for vehicles or persons. He also checked the suspect barn before withdrawing.

On the night of November 7, 1980, Goldston and Fite again entered the Dunn property. This was the first post-warrant visit to the ranch. They made no effort to effect seizures pursuant to the warrant, despite the claim of exigent circumstances set forth in the affidavit,[4] but merely observed the laboratory and departed.

At approximately 10:00 a. m. on November 8, 1980, the warrant was executed. DEA agents, accompanied by state law enforcement personnel, drove to the ranch and found Dunn. Officer Fite, armed with a shotgun, arrested Dunn, placed him in handcuffs, and escorted him into the ranch house while other officers loaded the chemicals and equipment and searched the premises.

Dunn was informed of his *Miranda* rights.[5] Thereafter, in response to a ques-

*United States v. Astroff*, 578 F.2d 133 (5th Cir. 1978), a warrant may be invalidated for misstatements in an affidavit only if the misrepresentations were *material and intentional.*" *United States v. Lewis*, 621 F.2d 1382, 1389 (5th Cir. 1980) (emphasis added). No evidence of intentional misrepresentation was offered.

3. The electronic sensors were not designed to intercept conversations. They were placed near the driveway and on the barn gate to detect the passage of vehicles or persons.

4. The warrant affidavit reads:
 Affiant states that the contraband in the instant case is such that it can be easily destroyed and that since the illicit manufacture of phenylacetone, amphetamine and methamphetamine is a process taking several hours and often conducted through the nighttime hours as well as the daytime, affiant requests authority to execute at any time (day or night).

5. Under *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 649 (1966), the accused must be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one

tion whether any controlled substances were in the house, he directed the officers to a closet which contained bags of amphetamine.[6]

### The Fourth Amendment Conundrum

The fourth amendment challenge to the evidence obtained from the execution of the search warrant, as well as to the evidence resulting from the earlier visits to the ranch, squarely presents the elusive expectation of privacy issue. If Dunn's fourth amendment protections were abrogated by the entries on November 5 and 6, the evidence discovered at that time and later seized pursuant to the warrant[7] must be excluded and Dunn's convictions must be set aside. That same reasoning does not apply to Carpenter since he cannot assert a legitimate expectation of privacy in any place searched or item seized.[8]

Although not specifically enumerated in the Constitution, the right of privacy long has been recognized.[9] Property interests once were considered paramount in fourth amendment applications. *See, e.g., Goldman v. United States*, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942); *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928).[10] But as the Supreme Court observed in *Rakas v. Illinois*, its decision in *Katz v. United States* repudiated *Olmstead* and *Goldman* and "held that capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." 439 U.S. at 143, 99 S.Ct. at 430, 58 L.Ed.2d at 401. *See United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United*

will be appointed for him prior to any questioning if he so desires...."

6. A dispute exists whether Dunn asserted or waived his right to the presence of counsel before speaking. Dunn's account is supported by the testimony of one agent who recalled that Dunn said he would "like to talk to his lawyer prior to making a decision." It is possible that *Miranda* and its progeny may have compelled the cessation of questioning. We do not decide that issue, however; our disposition of the appeal makes the resolution of this question unnecessary.

7. The bulk of the warrant affidavit was composed with information obtained as a result of the warrantless entries on November 5 and 6.

8. Carpenter neither enjoyed nor claimed any possessory or proprietary interest in the Dunn ranch or in the items found therein. In *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), the Supreme Court rejected the automatic standing rule for possession offenses of *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). As a consequence, Carpenter is without standing to assert a fourth amendment claim. *See United States v. Whitley*, 670 F.2d 617 (5th Cir. 1982). *See also Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Meyer*, 656 F.2d 979 (5th Cir. 1981).

9. Writing in another context, Justice Blackmun noted that while the
> Constitution does not explicitly mention any right of privacy ... a line of decisions ... going back ... as far as *Union Pacific R. Co.*

> v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000 [1001] 35 L.Ed. 734 (1891) ... has recognized that a right of personal privacy, or a guarantee of certain ... zones of privacy does exist under the Constitution. In varying contexts, the Court ... found ... the roots of that right in the First Amendment ...; in the Fourth and Fifth Amendments ...; in the penumbras of the Bill of Rights, ... in the Ninth Amendment ...; or in the concept of liberty guaranteed by the first section of the Fourteenth Amendment....

*Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147, 176 (1973) (citations omitted).

10. Justice Brandeis' *Olmstead* dissent provides a more modern perspective of the intent of the framers in drafting the fourth amendment:
> They conferred, as against the Government, the *right to be let alone*—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed must be deemed a violation of the Fourth Amendment.

277 U.S. at 478, 48 S.Ct. at 572, 72 L.Ed. at 954 (Brandeis, J., dissenting) (emphasis added). More recently, it has been stated that "[t]he central purpose of the Fourth Amendment is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *South Dakota v. Opperman*, 428 U.S. 364, 377, 96 S.Ct. 3092, 3101, 49 L.Ed.2d 1000, 1009-10 (1976) (Powell, J., concurring) (citations omitted).

*States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). However, considerations of property interests are not irrelevant to the legitimate expectation of privacy analysis, for "by focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, the Court has not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by that Amendment." *Rakas v. Illinois*, 439 U.S. at 143 n.12, 99 S.Ct. at 431 n.12, 58 L.Ed.2d at 401 n.12. The decisional standard developed in *Rakas* traces Justice Harlan's suggestion in his concurrence in *Katz*; specifically, the individual asserting the privacy interest must demonstrate an actual (subjective) expectation of privacy and the expectation must be in accord with societal notions of reasonableness.[11]

Dunn maintains that he held a reasonable expectation of privacy over his ranch property and the buildings thereon, particularly the barn and its contents. Evaluation of this contention requires a close look at several essential facts.

The ranch, modest in size for that area of Texas, is approximately 198 acres, and is encircled by a perimeter fence. The residence and the other buildings are in a small clearing almost entirely surrounded by trees. The house and the barns are not visible from the farm to market road; they are not visible from the perimeter fence. There are interior fences, including one around the residence and one around the subject barn. Once inside the perimeter fence, it is necessary to penetrate at least one more fence before reaching the place where the officers stood while examining the interior of the barn.

■ We commence our legal analysis, mindful of the basic constitutional rule that " 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions,' " *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971) (*quoting Katz v. United States*, 389 U.S. at 357, 88 S.Ct. at 514, 19 L.Ed.2d at 585). In that vein, the government's defense of the fourth amendment challenge relies on *United States v. Williams*, 581 F.2d 451 (5th Cir. 1978), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979), to excuse the necessity for a warrant for the entries of November 5 and 6. *Williams* does not support the government's position.

In *Williams*, agents of the Bureau of Alcohol, Tobacco and Firearms (ATF), acting on a tip, visited a site in rural Mississippi which was suspected of housing a "still." The still could not be seen from the public roadway and the agents walked along a perimeter fence, approaching the outbuildings on the property. From the edge of an old fence, outside the curtilage of the farmhouse and perhaps off the subject property, the agents "detected the odor of moonshine liquor and fermented mash coming from the direction of the hogpen." 581 F.2d at 453. The agents crossed the remnants of a fence "at a place where it had been walked down almost to the ground," *id.*, and traced the odors to a large shed. With this information, a search warrant was obtained and executed, ·at which time Williams was ar-

---

11. In invigorating the phrase "reasonable expectation of privacy," the Supreme Court has suggested that a weighing of the government's interest in the public health and welfare against the individual's rights is required. A balance of competing interests has been referred to as the "ready test for determining reasonableness." *Terry v. Ohio*, 392 U.S. 1, 20–21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968) (*quoting Camara v. Municipal Court*, 387 U.S. 523, 536, 87 S.Ct. 1727, 1734, 18 L.Ed.2d 930 (1967)). *See Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d

357 (1979); *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). And as we cryptically have opined: "The metaphysics of property interests and possessory interests under the Fourth Amendment determine whether there is a legitimate expectation of privacy." *United States v. Lewis*, 621 F.2d at 1388.

rested while carrying three gallons of moonshine.[12]

In *Williams*, we recognized that the expectation of privacy test "has done away with outmoded property concepts no longer satisfactory for fourth amendment analysis," *id.* (*citing The Supreme Court, 1967 Term*, 82 Harv.L.Rev. 63, 189 (1968)), but noted that "the distinction between open fields and curtilage is still helpful in determining the existence or not of reasonable privacy expectations." *Id.* (*citing* Note, 76 Mich.L.Rev. 154 (1977)). We further remarked "that open fields surrounding a house are not protected under the fourth amendment and that a search of them need not be accompanied by a warrant issued upon probable cause." *Id.* (*citing United States v. Brown*, 473 F.2d 952 (5th Cir. 1973); *Atwell v. United States*, 414 F.2d 136 (5th Cir. 1969); *Hodges v. United States*, 243 F.2d 281 (5th Cir. 1957)).

We concluded that the protected curtilage extended to the shed in question and held that:

> as to outbuildings that are not encompassed by a fence that also includes the house, or perhaps a privacy or exclusionary one around them, the outer limits of the curtilage are defined by the walls of the remote outbuildings.

581 F.2d at 454. Notwithstanding, we determined that the agents had not violated the fourth amendment because they did not enter the shed. Additionally, the dilapidated fence they crossed was not viewed as either a privacy or exclusionary fence, since "in its best days it was meant to do no more than keep the hogs in, not to keep anyone out." *Id.*

Shortly after we rendered our *Williams* decision the Supreme Court announced *Rakas v. Illinois*. We disagree with the suggestion that the decisions are in conflict. Because the boundaries of the farm in *Williams* were not marked, and because the

only manifestation of a privacy assertion or a proprietary exclusion was a broken down fence, subjective privacy expectations were lacking. Thus, the *Williams* decisional methodology comports fully with the guide established in *Rakas*.

■ By contrast, the fence around Dunn's ranch was complete and intact. The barn itself was circled by another substantial fence. Under *Williams* and earlier jurisprudence, *see Walker v. United States*, 225 F.2d 447 (5th Cir. 1955), the barn in question was within the curtilage of the residence and was within the protective ambit of the fourth amendment. "Certainly such buildings give an added expectation of privacy for their contents...." *United States v. Williams*, 581 F.2d at 454. Having reached this conclusion, we must now consider the government's contention that the warrantless entries on November 5 and 6 were justified by exigent circumstances.

### Probable Cause and Exigent Circumstances

The government makes a compelling argument that it had probable cause to act, a contention supported by the factual background of the case. The following factors all tend to bolster the reasonable belief that a criminal offense had been or was being committed: the accumulation of equipment and large quantities of chemicals, all purchased with cash and some acquired under a false name; the tracking of the chemicals to the Dunn ranch; the detection of the lost hot plate stirrer beeper signal on the Dunn property; Dunn's prior criminal record; and the remote location of the ranch. Accepting that probable cause to search the ranch property existed on November 5 and 6, a search warrant was mandatory unless exigent circumstances excused that constitutional requirement.

---

**12.** The *Williams* court noted that "the government unaccountably concedes standing." 581 F.2d at 453 n.2. While the issue of standing to claim a fourth amendment violation was not raised or discussed, it does not appear that Williams possessed any legitimate expectations

of privacy over the shed or its contents. In light of the Supreme Court's *Salvucci* opinion and our *Whitley* decision, if Williams' case was tried today, he would not be heard on a fourth amendment challenge.

In support of the claim that exigent circumstances validated the warrantless searches, the government relies on *United States v. Villarreal*, 565 F.2d 932 (5th Cir.), *cert. denied*, 439 U.S. 824, 99 S.Ct. 92, 58 L.Ed.2d 116 (1978). *Villarreal* stands for the proposition that an officer making a legal stop of an automobile, who smells the odor of marihuana coming from the automobile, may conduct a search for that contraband. *See United States v. Barnard*, 553 F.2d 389 (5th Cir. 1977); *United States v. Andrade*, 545 F.2d 1032 (5th Cir. 1977); *United States v. McCrary*, 543 F.2d 554 (5th Cir. 1976); *United States v. Diaz*, 541 F.2d 1165 (5th Cir. 1976). The government attempts to use the thread from these decisions to weave a net in the instant case, suggesting that since an officer who smells the odor of marihuana emanating from an auto legally stopped may search for the source, a DEA agent who smells phenylacetic acid likewise may search for the source. Neither logic nor jurisprudence supports this reasoning, however, for the two situations are not parallel. The officers in the cited cases were performing their duties in a legal fashion; they were where they had a duty and a right to be. While in these positions they detected the odor of contraband. In these situations, they were allowed and were required to seek the source.

■ But that was not the circumstance in the case at bar. The law enforcement officers were trespassing, having crossed a perimeter fence prior to detecting the suspicious odor. In addition to that basic dissimilarity, the odor detected was not that of a contraband. The officers in the *Villarreal* line of cases smelled a controlled substance; the DEA agent on Dunn's ranch smelled a legal chemical, phenylacetic acid. Even if it had been the odor of contraband, the occurrence of the trespass before the detection would vitiate the use of this information. A release from fourth amendment requirements cannot be based on fourth amendment violations. *See, e.g., Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). *See also Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

■ The cited cases are subject to a further, critical distinction: they all involve an automobile. While motor vehicles and other means of transportation are protected by the fourth amendment,[13] they receive markedly different treatment.[14] Notably, the Supreme Court has observed:

> this Court has recognized significant differences between motor vehicles and other property which permit warrantless searches of automobiles in circumstances in which warrantless searches would not be reasonable in other contexts.... The answer lies in the diminished expectation of privacy which surrounds the automobile....

*United States v. Chadwick*, 433 U.S. at 12, 97 S.Ct. at 2484, 53 L.Ed.2d at 549 (citations omitted). Practically speaking, when a vehicle is involved and probable cause to

---

13. *See, e.g., Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Preston v. United States*, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); *Rios v. United States*, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

14. *See, e.g., New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). *See also United States v. Michael*, 645 F.2d 252 (5th Cir. 1981) (en banc).

search exists, exigent circumstances usually are present.[15]

■ The contention that exigent circumstances existed in the present case is belied by the facts perceivable at the time, confirmed with the 20/20 visual acuity of hindsight.[16] Although the agents expressed concern that the laboratory might be dismantled and moved before a warrant could be obtained, this argument is not persuasive. The area was remote. Access was limited, particularly vehicle ingress and egress. In addition, the ranch property was subject to surveillance readily from both the ground and the air.

Moreover, in light of the actions of the agents, the protestations of urgency, including those recited in the warrant affidavit, are not convincing. Although obtained on the night of November 6, 1980, the warrant was not executed until approximately 10:00 a. m. on November 8, despite the entry of agents on November 7. The necessity for swift action, which purportedly justified the warrantless entries on November 5 and 6, is not apparent in the officers' post-warrant conduct.

■ The government bears the burden of justifying a warrantless search. *United States v. De LaFuente*, 548 F.2d 528 (5th Cir.), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977). *See United States v. Osborne*, 630 F.2d 374 (5th Cir. 1980), *cert. denied*, 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 369 (1981). It has not borne this burden. Consequently, the evidence gathered during the search on No-vember 8, 1980, by virtue of a warrant issued on the basis of information collected during unconstitutional entries and viewings, should have been excluded from the case against Dunn. Admission of the evidence was reversible error which mandates a remand for a new trial.

### Dunn's Statements

In determining whether Dunn's inculpatory statements uttered shortly after his arrest on November 8 must be excluded from evidence, we are guided by the teachings of *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). *See, e.g., United States v. Vicknair*, 610 F.2d 372 (5th Cir.), *cert. denied*, 449 U.S. 823, 101 S.Ct. 83, 66 L.Ed.2d 25 (1981). The district court declined to suppress the remarks Dunn made at the time of his arrest. We must decide whether the illegality of the warrantless searches, which led to the issuance of the search warrant and to Dunn's arrest, irretrievably tainted those statements.

We are aware of no bright-line formula to resolve the dilemma and we are mindful that "[n]ot every fruit that grows from poisonous trees is constitutionally lethal." *United States v. Vicknair*, 610 F.2d at 381. Exclusion is not justified if the government demonstrates that the connection between an illegal search and the evidence obtained has become "so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939).[17] While degrees of attenuation

---

**15.** The "inherent mobility of automobiles creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible." *South Dakota v. Opperman*, 428 U.S. at 367, 96 S.Ct. at 3096, 49 L.Ed.2d at 1004 (citations omitted). Even disregarding the issue of mobility, "less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than relating to one's home or office." *Id.* (footnote omitted). *See Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967).

**16.** The determination of probable cause and exigent circumstances must be based on the circumstances as they existed at the time of the challenged action, and must be viewed from the perspective then obtaining. Our reference to hindsight in no way modifies that well-established rubric.

**17.** The "independent source" doctrine which also excuses the exclusion of certain evidence, *see, e.g., Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *United States v. Fredericks*, 586 F.2d 470 (5th Cir. 1978), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979), does not apply to the instant factual situation. Nor does

necessarily are determined on a case-by-case basis, the *Ceccolini* Court offered the following methodological outline:

> Evaluating the standards for application of the exclusionary rule to live-witness testimony . . ., we are first impelled to conclude that the degree of free will exercised by the witness is not irrelevant in determining the extent to which the basic purpose of the exclusionary rule is advanced by its application. This is certainly true when the challenged statements are made by a putative defendant after arrest, *Wong* [*v. United States*, 371 U.S. at 491, 83 S.Ct. at 407]; *Brown v. Illinois* [422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) ], and *a fortiori* is true of testimony given by nondefendants.

435 U.S. at 276, 98 S.Ct. at 1060, 55 L.Ed.2d at 277.

 We are in accord with the analysis of our colleagues of the Ninth Circuit who distinguished "the 'live witness' testimony of a potential co-defendant . . . [from] that of a witness not arrested and not implicated in the criminal activities at issue." *United States v. Humphries*, 600 F.2d 1238, 1247 (9th Cir. 1979), *cert. denied*, 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981). In the present case, Dunn was arrested; he uttered the incriminating statements shortly thereafter. The inculpatory statements were the product of the prior illegality and not of his free will. The arrest was related directly to a search which was authorized on the basis of recent violations of Dunn's privacy rights. Although the matter is not free from difficulty, we are convinced that the taint of the unlawful entries onto the Dunn ranch, which culminated in Dunn's arrest on the premises, had not been so attenuated as to permit use of the statements against Dunn.

*Carpenter—Sufficiency of the Evidence*

 Carpenter contends that the evidence is insufficient to sustain his convictions. We disagree. Viewing the evidence

the "inevitable discovery" principle, *see, e.g., Brewer v. Williams*, 430 U.S. 387, 97 S.Ct.

in the light most favorable to the government, *see, e.g., Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Ocanas*, 628 F.2d 353 (5th Cir. 1980), we conclude that the jury could properly find Carpenter guilty beyond a reasonable doubt.

The convictions of Robert Lyle Carpenter are AFFIRMED.

The convictions of Ronald Dale Dunn are REVERSED and the matter is REMANDED for further proceedings not inconsistent herewith.

1232, 51 L.Ed.2d 424 (1977), fit this case.