**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Rex A. BALDWIN, Defendant-Appellant.**

No. 82–2062
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Nov. 2, 1982.

---

Kenneth W. Sparks, James E. Rose, Houston, Tex., for defendant-appellant.

James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, and POLITZ and HIGGINBOTHAM, Circuit Judges.

POLITZ, Circuit Judge:

A bench trial culminated in the conviction of Rex A. Baldwin for manufacturing and possessing methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). On appeal, Baldwin challenges

the denial of his motion to suppress physical evidence and the admission in evidence of a post-arrest statement. Finding no merit in the former contention and a harmless error override of the latter, we affirm.

### Background Facts

On June 22, 1981, Drug Enforcement Administration Agent Ronald Gospodarek, an officer with extensive drug enforcement experience, received a tip from a confidential informant that Baldwin was illegally manufacturing drugs on rented property near Hungerford, Texas. The informant accompanied Gospodarek and local police officers to the premises. Later that night the DEA agent and the local officers returned for a closer look.

Baldwin leases approximately 16 acres of wooded land in a rural area. The residence and two outbuildings are located in a small clearing bordered by trees and bushes. There is no perimeter fence; the only fence on the tract, three feet high and constructed of chicken wire and slatboard, encircles a metal building located 30 to 40 feet behind the residence. Access to the entrance driveway is blocked by a locked gate bearing two signs: "Keep Out" and "Beware of the Dog." Baldwin testified that one "Keep Out" sign was nailed to a tree on the northern boundary of the property and another was nailed to a tree on the southern boundary. He did not post the signs nor was he aware of the identity of the person who did. Gospodarek did not see the perimeter signs. A picture filed in evidence avails naught in this inquiry, nor does the record contain evidence to corroborate the existence of these signs.

The northwest quadrant of the acreage, to the rear of the residence, is traversed by a utility easement connecting the residence enclave to Baldwin Drive, a public road. Leaving his companions near the roadway, Gospodarek followed the utility easement to the enclave. From this vantage point he detected the distinctive scents of amine and solvent ether which he perceived to be a signal of the manufacture of methamphetamine. There was also a humming sound which Gospodarek associated with the operation of a vacuum motor used in the methamphetamine manufacturing process. Gospodarek assumed these odors and the sound emanated from the metal outbuilding of which the informant had advised him.

Gospodarek then stepped into the underbrush for cover and crawled to within a few feet of the metal building. He did not cross the encircling fence. Looking through an opening in the lighted building, he saw three brown jugs of a type commonly used to store light-sensitive precursor chemicals required for the synthesis of methamphetamine. No persons were observed in the area. At this point Gospodarek's presence evoked a cacophony of protest from several farm animals, precipitating his hasty retreat down the easement to the public road where his colleagues awaited.

Incorporating his observations and the information received from the confidential informant into an affidavit, Gospodarek sought and was granted a search warrant. Armed with the warrant he returned the next day and resumed his position near the metal building. The sights, scents and sound of the previous night were unchanged. Again, no human activity was observed and the officer left without executing the search warrant.

On June 24, 1981, the officers reinstituted surveillance, Gospodarek detected the tell-tale odor, heard the sound of the motor, and observed Baldwin making several trips between the suspect building and residence. Finally, Baldwin exited the metal building carrying a plate laden with brown powder. The officers withdrew and Gospodarek contacted the magistrate to communicate the results of the surveillance and correct an item of information contained in the search warrant.[1] The magis-

---

1. Gospodarek's affidavit, upon which the warrant was issued, described the metal building as being white whereas the building was white and green. Gospodarek testified that he first saw the building at night and was unable to detect its colors. After seeing the building in the daylight its true colors were apparent. The magistrate was not impressed with this vari-

trate gave apparent approval for execution of the warrant and the officers returned to the residence to do so.

The search of the metal building disclosed a complete methamphetamine laboratory, a quantity of methamphetamine and various component chemicals. Baldwin was arrested, given a partial *Miranda* warning and questioned until he declined to make a statement. Hours later, as the officers were preparing to depart, Baldwin protested the imminent arrest of his wife, stating that the contents of the metal building were his exclusively and that she was not involved. Mrs. Baldwin was not arrested.

Baldwin's pretrial motion to suppress all evidence seized at the time of the search and arrest, including the statement elicited during his subsequent detention, was denied. His fourth amendment claim is grounded upon the government's introduction of the physical evidence seized pursuant to the warrant; the admission of the statement is contested under *Miranda* and its progeny.

### Fourth Amendment

■ Baldwin maintains that the physical evidence seized during the execution of the search warrant must be suppressed because the warrant was issued on the basis of an affidavit containing information gleaned from a constitutionally forbidden trespass. Baldwin's position as tenant entitles him to invoke the protections of the fourth amendment. *See Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

■ The fourth amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects" through the prohibition of "unreasonable searches and seizures." Traditional common law concepts of property rights, which once served to delineate the scope of the fourth amendment's protection have, since the Supreme Court's pronouncement in *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), that the "amendment protects people, not places," been rejected in favor of the "legitimate expectation of privacy" test. *Rakas v. Illinois,* 439 U.S. at 143, 99 S.Ct. at 430. Thus guided, we must measure the reasonableness of a particular search and seizure in terms of the legitimacy of an individual's expectation of privacy in the object or area searched.

■ Despite its repudiation of archaic principles of property law in *Katz,* the Supreme Court has recognized that property rights play some role in the process of ascertaining the existence of the requisite privacy interest. Fourth amendment jurisprudence has since evolved into a two-pronged analysis: has the individual asserting the privacy interest evidenced a subjective expectation of privacy, and does this expectation conform to societal precepts of reasonableness. *United States v. Dunn,* 674 F.2d 1093 (5th Cir. 1982). Property rights, insofar as they "reflect society's explicit recognition of a person's authority to act as he wishes in certain areas," are therefore to be taken into account in evaluating one's actual expectation of privacy. *Rakas v. Illinois,* 439 U.S. at 153, 99 S.Ct. at 435 (Powell, J., concurring).

■ Consistent with this rationale, we have continued to find the distinction between open fields and curtilage useful in assessing the reasonableness of an individual's privacy assertion. Whereas open fields are not deemed to fall within the protective ambit of the fourth amendment, the curtilage, or the immediate appurtenances, of a home may not be searched without a warrant, absent exigent circumstances. *United*

---

ance, nor are we under the circumstances presented.

Under the rule of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a search warrant may not be invalidated for misrepresentations in the underlying affidavit unless such misrepresentations are material and intentional. *United States v. Namer,* 680 F.2d 1088 (5th Cir. 1982). There being no evidence to the contrary, we believe the district court correctly determined that the error in question was committed in good faith and was not material to the showing of probable cause.

States v. Dunn; United States v. Williams, 581 F.2d 451 (5th Cir. 1978), cert. denied, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979). An outbuilding "not encompassed by a fence that also includes the house, or perhaps a private or exclusionary one" was nonetheless considered part of the curtilage, the parameters of which were defined to include the "walls of the remote outbuildings." Williams, 581 F.2d at 454.

In Williams we sought to define curtilage within a specific factual setting. In Dunn we summarized the Williams facts:

> In Williams, agents of the Bureau of Alcohol, Tobacco and Firearms (ATF), acting on a tip, visited a site in rural Mississippi which was suspected of housing a "still." The still could not be seen from the public roadway and the agents walked along a perimeter fence, approaching the outbuildings on the property. From the edge of an old fence, outside the curtilage of the farmhouse and perhaps off the subject property, the agents "detected the odor of moonshine liquor and fermented mash coming from the direction of the hogpen." 581 F.2d at 453. The agents crossed the remnants of a fence "at a place where it had been walked down almost to the ground," id., and traced the odors to a large shed. With this information, a search warrant was obtained and executed, at which time Williams was arrested while carrying three gallons of moonshine.

674 F.2d 1099–1100. Based on these facts, we concluded that while the protected curtilage extended to the subject shed, the agents had not impinged upon the defendant's reasonable expectation of privacy because they had remained outside the shed. The dilapidated fence they had traversed was regarded as no more than a barrier designed to "keep the hogs in, not to keep anyone out," and hence could not be characterized as a privacy or exclusionary fence. 581 F.2d at 454. Although Williams preceded the Supreme Court's decision in Rakas,

the latter has not affected the continuing vitality of the curtilage-open field distinction. United States v. Dunn, 674 F.2d at 1100.

As in Williams, we find no fence commanding privacy or exclusion. Baldwin maintains, however, that the vines and trees bordering the residential enclave constitute a natural fence which clearly manifests his exclusionary intent. Citing the panel decision in United States v. Holmes, 521 F.2d 859 (5th Cir. 1975), aff'd by an equally divided court, 537 F.2d 227 (5th Cir. 1976) (en banc), Baldwin suggests that this vegetation, rather than the walls of the metal outbuilding, defines the perimeter of the curtilage. In Holmes, an agent moving stealthily through a heavily wooded area behind the defendants' house spotted a small shed 20 yards to the rear of the house. From his position within the woods, the agent smelled marihuana. Burlap bags typically used to package this substance could be seen through a large hole in the shed. In finding this search constitutionally proscribed, the panel stated that "a dweller in a rural area whose property is surrounded by extremely dense growth, need not anticipate that government agents will be crawling through the underbrush." 521 F.2d at 870.

As we later observed in Williams, our en banc affirmance of the Holmes panel's treatment of the "natural barrier" issue was rendered by an equally divided court and was therefore without precedential value. United States v. Williams, 581 F.2d at 454. Seven judges joined Judge Ainsworth's dissent from the majority's holding with respect to the search of the shed. Thus, despite the suggestion to the contrary in the majority per curiam opinion,[2] the en banc court divided 8–8 on this issue.[3] The dissenting judges took note of the complete absence of evidence bearing on the limits of defendant's property or the agent's trespass upon the protected curtilage. Hence, in

---

2.  537 F.2d at 228 n.2.

3.  See dissent by Judge Ainsworth, joined by then Chief Judge Brown and Judges Gewin,

Roney, Gee, Tjoflat and James C. Hill, 537 F.2d at 228, and by now Chief Judge Clark, in part, 537 F.2d at 237.

their view, "[i]t was error to hold that ... [the agent] was a trespasser on the curtilage as he looked into the shed from his position in the heavy cover or that his observation through the large hole in the shed was an illegal search." 537 F.2d at 233 (Ainsworth, J., dissenting). *Williams,* although factually apposite, provides only minimal guidance on this aspect of Baldwin's challenge. There, the surveilling agents crept through a wooded area which abutted the bounds of the curtilage as delineated by the *Williams* court. It is not clear that the defendant possessed a proprietary interest in the area traversed. Furthermore, the clearing between the woods and the subject outbuilding was categorized as an open field wherein there was no cognizable expectation of privacy.

■ We need not determine in the instant case whether the parameters of the curtilage extend past the most remote outbuilding to the outermost limits of a natural barrier encircling the residence and its appurtenances. First, agent Gospodarek testified that from the easement, beyond the wood and vine covered area through which he crawled to reach the outbuilding, he perceived the distinctive odors of methamphetamine precursors and heard the whirring of what he believed to be a vacuum pump. These sensory indicia of methamphetamine production, when coupled with the knowledge gained from an informant he considered reliable [4] and assessed in light of the agent's training and experience, suffice to constitute probable cause.

■ Second, there is scant evidence in the record bearing on the character of the foliage in question. Without some understanding as to the composition of the undergrowth, including its density, height, outline, relative placement, and the degree to which it can be visually penetrated from both the exterior and interior, we cannot ascertain the reasonableness of a person's expectation of privacy therein.

We therefore defer the decision whether a barrier erected by nature may function as a manifestation of proprietary exclusion entitled to the fourth amendment's protection. That decision must await a time when we are presented with a record which permits the accurate weighing of a defendant's privacy interest in vegetation, or other natural or man-augmented natural phenomena, enclosing the traditional curtilage—the residence and its appurtenances.

In sum, we conclude that Baldwin did not possess a reasonable expectation of privacy with respect to the area from which Gospodarek gathered information critical to the determination of probable cause. Thus, the warrant was valid; the motion to suppress on fourth amendment grounds was properly denied.

*Fifth Amendment*

■ Baldwin protests, on *Miranda* grounds, the introduction of the post-arrest statement wherein he assumes full responsibility for the contents of the outbuilding and attempts to exonerate his wife. We view the introduction of this statement, if error, to be "harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Because of this finding we need not determine whether the statement was spontaneous or solicited during the course of custodial interrogation. Nor are we compelled to determine whether the *Miranda* warnings were adequate, whether Baldwin's invocation of the right to remain silent was appropriately honored, and whether he waived the pertinent rights.

■ It is now settled that in appropriate cases, violations of *Miranda's* teachings may fall within the purview of the harmless error rubric. *Harryman v. Estelle,* 616 F.2d 870 (5th Cir.) (en banc), *cert. denied,* 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980). Under the *Chapman* standard, we must judge the magnitude of the error in light of the evidence as a whole as a prelude to our decision whether, "absent the ... unconstitutional effect, the evidence remains not only sufficient to sup-

---

4. There is no challenge to the reliability of the informant.

port the verdict but so overwhelmingly so as to establish the guilt of the accused beyond a reasonable doubt." *Id.* at 876.

Applying these guidelines to the case at bar, and proceeding on the assumption that the statement in question was obtained in contravention of *Miranda,* we conclude that the admission of the statement does not warrant reversal. Having determined that the fruits of the search were properly admitted, we have no difficulty in characterizing as overwhelming the independent evidence of Baldwin's guilt. There is no contention on Baldwin's part that the introduction of the statement exerted an adverse impact upon the conduct of his defense, nor does our review of the record disclose any such impact. Accordingly, the statement constituted mere cumulative evidence, and its admission, if erroneous, was harmless beyond a reasonable doubt.

AFFIRMED.