SCHROEDER, GEDLEN, RIESTER & MOERKE, a law
partnership, by C. James Riester,
partner thereof, Plaintiffs,

v.

Harold SCHOESSOW, Defendant,

Kenneth G. CARLSON, Russell D. Jones, and
Eugenie Esser,
Defendants-Third-Party Plaintiffs-Appellants-
Petitioners,

CITY OF MEQUON, a municipal corporation organized
under the laws of Wisconsin,
Third-Party Defendant-Respondent.

Supreme Court

*No. 80–528. Argued March 3, 1982.—Decided July 2, 1982.*

(Also reported in 321 N.W.2d 131.)

For the defendants-petitioners there were briefs by *Richard E. Reilly* and *Gimbel, Gimbel & Reilly* of Milwaukee, and oral argument by *Richard E. Reilly*.

For the third-party defendant-respondent there was a brief by *Robert A. Christensen, Nancy J. Sennett* and *Foley & Lardner* of Milwaukee, and oral argument by *Mr. Christensen*.

HEFFERNAN, J.   This is a review of a decision of the court of appeals, 103 Wis. 2d 380, 309 N.W.2d 10 (Ct. App 1981), affirming a judgment of the circuit court for Ozaukee county on March 20, 1980, J. TOM MERRIAM, Circuit Judge, *Presiding*.

The question posed in this case is whether summary judgment was properly granted to the city of Mequon dismissing a third-party complaint of certain aldermen who sought indemnification against the city for attorney fees incurred in contesting an order to show cause why they should not be found in contempt for failing to comply with a peremptory writ of mandamus directing them to vote to allow the connection of certain sewer extensions.

The circuit court held that the city, under sec. 895.46 (1), Stats.,[1] could only be liable for attorney fees under

---

[1] Sec. 895.46(1), Stats., pertinent to this review provides:

"895.46 **State and political subdivisions thereof to pay judgments taken against officers.**  (1)(a) If the defendant in any action or special proceeding is a public officer or employe and is proceeded against in an official capacity or is proceeded against as an individual because of acts committed while carrying out duties as an officer or employe and the jury or the court finds that the defendant was acting within the scope of employment, the judgment as to damages and costs entered against the officer or employe in excess of any insurance applicable to the officer or employe shall be paid by the state or political subdivision of which the defendant is an officer or employe. Agents of any department of the state shall be covered by this section while acting within the scope of any written agreement entered into prior to the

circumstances where the city would be absolutely liable for the underlying civil judgment. It further held that the conduct of the aldermen in failing to comply with the writ of mandamus was "colored with criminal mis-conduct" or, at best, constituted an intentional tort, for which the city could not be liable.

The court of appeals in affirming followed a similar rationale, holding in essence that summary judgment was appropriate because, in addition to the reasons given by

occurrence of any act which results in any action or special proceeding. Regardless of the results of the litigation the governmental unit, if it does not provide legal counsel to the defendant officer or employe, shall pay reasonable attorney fees and costs of defending the action, unless it is found by the court or jury that the defendant officer or employe did not act within the scope of employment. . . ."

The pleadings of the city acknowledge that, during all of the proceedings, the aldermen were within the scope of their employment. The city's only defense was that alleged as an affirmative defense—that the conduct of the aldermen, though within the scope of their employment, was criminal in nature and, hence, as a matter of law under the rule of *Bablitch*, not within the purview of sec. 895.46(1), Stats. As demonstrated above, both the mandamus and contempt proceedings were civil in nature. Because both of these proceedings were dismissed, it is perhaps almost irrelevant for the trial court to make further findings. Scope of employment is conceded. Hence, it appears that all that remains to be done is to examine the reasons why the aldermen refused to comply with the peremptory writ. If their conduct was motivated by their legislative concern for the protection of the health and welfare of the community, and was not motivated by willfulness or caprice, their conduct was in good faith, was legislative and discretionary, and was not subject to mandamus.

The mandamus action, however, has been dismissed, and it is now too late to make specific findings in that action. Nevertheless, we feel that the city should have the opportunity to insist that evidence be considered which will or will not justify payment of attorney fees. In other words, as an element of the present action for attorney fees, the city has the burden of showing that the aldermen were not in good faith in asserting the legislative and discretionary prerogative.

the trial court, the aldermen were, as a matter of law, acting beyond the scope of their employment when they acted "contrary to the express order of the court." (103 Wis. 2d at 386)

We conclude that both the circuit court and the court of appeals erred in determining that the city was entitled to summary judgment as a matter of law. We conclude that both courts erred in respect to matters of law and, in addition, that there was an issue of fact that was required to be determined. Hence, we reverse and remand for additional proceedings.

The narrow question presented on this review is whether the trial court and the court of appeals, on appeal, properly determined that, as a matter of law, summary judgment dismissing a third-party complaint for attorney fees was appropriate.

This action for attorney fees has its origin in prior conduct of the common council of the city of Mequon and its aldermen.

A chronology of events shows that, in February of 1978, Ted Weissinger, a land developer, obtained the city of Mequon common council's approval of a concept plat for a proposed development. Subsequently, on May 2, 1978, the common council unanimously passed a resolution which provided that no new sewer extensions would be granted for developments in the area to be served by the Cedarburg Road Sanitary Sewer Trunk unless the sewer extensions were given the specific approval of the council following the recommendation of its committee on public works and the city engineer. That resolution indicated that additional extensions would be likely to result in the overflow of excess sewage into a river and into a low-lying area.

On September 5, 1978, Weissinger appeared before the common council inquiring whether it was the intent of the May 2 resolution to curtail sewer extensions to

his development, which had received concept plat approval in February. He pointed out that, even after the May 2 moratorium, he had continued to receive the assistance and cooperation of the city engineer's department and the planning department; and, accordingly, he assumed that the moratorium was not intended to apply to him. The city attorney gave the opinion that it was his belief that the moratorium did not apply to Weissinger's development.

The discussion that ensued indicated that at least some of the aldermen, following the initial plat approval, learned that underlying engineering data on which they based their approval had been predicated on dry-weather conditions and that subsequent experience had shown that, during wet weather between April and July, the system had not been able to handle the sewage and that over eight million gallons of raw sewage flowed into the Milwaukee River. Weissinger's request for explicit approval of sewer connections was referred to the committee on public works by a 4–3 vote of the aldermen. The aldermen who voted for this referral were Carlson, Jones, Esser, and Schoessow.

Weissinger forthwith commenced an action for mandamus in the circuit court for Ozaukee county to direct that the Mequon common council approve the sewer extensions. All seven of the members of the common council and the mayor were made respondents in the mandamus proceedings. On September 8, Judge Warren Grady issued an alternative writ directed to all the respondents ordering them on or before September 12 to grant Weissinger's sanitary sewer extensions or to show cause to the court why they had not done so.

The council met on September 12, and the discussion again indicated that the prior approval of the plat was predicated on the information available to them at that time, but that that information had been furnished on a

dry-weather basis and wet-weather problems which subsequently ensued had not been considered. On a roll call vote, the motion to approve the sewer allocations was defeated on a 4–3 vote. Aldermen Carlson, Esser, Jones, and Schoessow voted to deny approval.

On September 13, the city attorney moved to quash the alternative writ of mandamus on the ground that the council's decision was discretionary, rather than ministerial, and was therefore not a proper subject of mandamus. Judge Grady on September 19 issued a peremptory writ of mandamus commanding the common council to approve the sewer extensions to Weissinger's subdivision.

At a meeting following the service of the peremptory writ, a motion was made to approve the sewer extensions. Alderman Carlson moved to table the motion approving the extensions, pointing out that Alderman Schoessow, who had previously voted to deny the allocations, was out of the country, and he also suggested that the council obtain a stay of Judge Grady's ruling. The city attorney made no comment in respect to the possibility of obtaining a stay and stated that the council had no choice but to respond to the peremptory writ. The motion to table was defeated by a 3–3 vote. The principal motion to grant the sewer extensions failed to secure a majority, with Aldermen Carlson, Esser, and Jones voting against the motion. The mayor was not present at the meeting and, accordingly, was unable to break the tie.

On September 20, the president of the common council as acting mayor filed a return to the peremptory writ, stating that the common council at its September 19 meeting failed to approve of the sewer extensions. On the following day, Judge Grady ordered the three aldermen who voted against allowing the sewer extensions to show cause why they should not be cited for contempt. On that same day, these three aldermen apparently

were told by the city attorney that he would not represent them in any contempt proceedings and would not take an appeal from the peremptory writ of mandamus. At this time the dissenting aldermen contacted the law firm of Schroeder, Gedlen, Riester & Moerke to represent them.

On September 22, a hearing was held on the order to show cause, at which time the trial judge stated that failure to obey a peremptory mandamus constituted contempt. However, this statement was made not as a finding but as a legal generalization, and a careful scrutiny of those proceedings failed to reveal that any adjudication of contempt was made. During the hearing, however, the representative of the Schroeder law firm again asserted that the conduct of his clients, the dissenting aldermen, was discretionary and not ministerial and, hence, not amenable to mandamus. The court agreed to adjourn the hearing for the purpose of submitting evidence on that point. Accordingly, it appears that, at the close of the hearing on September 22, the circuit judge had not foreclosed his consideration of whether the conduct of the aldermen was discretionary or ministerial, nor had he made a finding of contempt. The hearing was adjourned until September 28.

The council met again on September 25, at which time Alderman Esser moved the adoption of a resolution authorizing and directing the appeal of the peremptory writ of mandamus and to appropriate funds to retain the Schroeder firm for that purpose.

That resolution recited that the city attorney had refused to represent the dissenting aldermen subsequent to the order to show cause why they should not be cited for contempt. Following discussion, the resolution was carried on a vote of 4–2. The next day, the mayor vetoed the resolution, because he believed that the resolution, by implication, directed that the city pick up the personal costs of any contempt proceedings. He stated that he felt

that was not a proper expense for the city to bear. He nevertheless urged the common council to authorize the appeal of this matter. A motion to override the mayor's veto failed to secure the necessary two-thirds vote.

Following the council meeting of September 25, the Schroeder firm filed notices of appeal from the peremptory writ which was entered on September 19 in the circuit court. One notice of appeal purported to be in behalf of the mayor and the entire common council of the city of Mequon and the other on behalf of Aldermen Carlson, Esser, and Jones. At the adjourned hearing of the circuit court proceedings, Judge Grady disallowed the filing on behalf of the entire council, because the city attorney, and not the Schroeder firm, was the only attorney of record for that body. Judge Grady, however, allowed the appeal on behalf of the three dissenting aldermen to stand.

The hearing on September 28 is significant in that the judge indicated that, were he to find the aldermen in contempt, he would proceed not under sec. 783.07, Stats. (formerly sec. 293.07), but under ch. 295, now renumbered as ch. 785. In other words, it is clear that the judicial proceedings for contempt were in contemplation of imposing a remedial sanction for the contempt which could be purged by compliance, not in contemplation of a punitive sanction for past conduct.

Additionally, after some discussion, which indicated that there was a possibility of satisfactorily reconciling the problems of the parties in the underlying mandamus proceedings, and after it was made clear that the dissenting aldermen had some rational basis for exercising their discretion not to permit the connections without some conditions:

"[The Court] feeling and thinking that perhaps maybe the door to compromise has been opened somewhat by statements of counsel here and these three Aldermen, I

will at this time withdraw temporarily my finding that these three are in contempt."

The record shows that, although the circuit judge talked in generalities about what circumstances would warrant the imposition of a finding of contempt, he at no time explicitly made such a finding. Moreover, in response to a direct question by counsel on whether there was a finding of contempt, the court stated, "[I have] withdrawn that ruling. It does not mean that I have found that they were not in contempt."

Accordingly, all that can be gleaned from the record is that the circuit court made no explicit finding of contempt, and to the extent that it is arguable that it was the judge's intention to make such finding, that finding was specifically withdrawn. Judge Grady's wisdom in so concluding those proceedings was vindicated when, under revised conditions, the common council of the city of Mequon on October 5 granted the sewer allocations to Weissinger and on October 9 the circuit judge, pursuant to stipulation entered into by Weissinger, the mayor, and the entire common council, explicitly dismissed the mandamus action and the contempt proceedings.

Accordingly, the record demonstrates that the mandamus action was dismissed, the peremptory writ was withdrawn, the contempt proceedings were dismissed without a finding that the three aldermen were in contempt, and Weissinger secured the sewer connections which he needed in order to have his development project proceed.

Although the council on October 5 agreed to the stipulation dismissing both the mandamus and the contempt actions, it failed to authorize payment of the bill of the Schroeder firm for legal services. Accordingly, the law firm commenced an action against the defendants, Aldermen Schoessow, Carlson, Jones, and Esser, seeking pay-

ment of their professional services. Three of the aldermen, Carlson, Jones, and Esser, denied liability and filed a third-party complaint against the City of Mequon alleging:

"That at all times material to this third party claim, the Third Party Plaintiffs had been made parties to a legal proceeding, in their official capacity as Aldermen for the City of Mequon. That at all times pertinent to the cause of this legal proceeding, the Third Party Plaintiffs were acting in the scope of their official duties as Aldermen."

They also alleged that the city had been notified of their need for legal services and that the city attorney and the common council had refused to furnish such service. They demanded that payment be made pursuant to sec. 895.46(1), Stats. In response to those allegations, the city of Mequon admitted that, during all of these proceedings, the third-party plaintiffs had been made parties to the legal proceedings in their official capacity, and that they had been acting within the scope of their duties as aldermen.

As an affirmative defense, however, the city of Mequon alleged that it had not afforded legal counsel in the contempt proceedings because "[the] third party plaintiffs were guilty of serious intentional misconduct which could have, among other things, subjected them to criminal contempt charges and personal liability."

The action for attorney fees proceeded in the circuit court for Ozaukee county; and the city of Mequon, on the basis of the above-recited facts, which were submitted in affidavit form, moved for summary judgment. The circuit court for Ozaukee county, J. Tom Merriam, Circuit Judge, granted the city's motion and dismissed the third-party complaint. The appeal to the court of appeals and the subsequent review to this court are in re-

spect to the judgment dismissing the third-party complaint.

The only issue posed on this review is whether the three aldermen may be entitled to indemnification for their attorney fees under the provisions of sec. 895.46(1), Stats. Putting aside for the moment the question of whether there are any issues of fact which must be resolved, we address ourselves first to the legal question of whether public officers in the position of the aldermen may recover their attorney fees against the city. Reflecting the position of the city, the circuit court concluded that there could be no city liability for the attorney fees, because the failure to comply with the writ of mandamus was "colored with criminal mis-conduct" or, at best, constituted an intentional tort. The court of appeals pointed out that the statute requires that public officers be within the scope of their employment to recover according to the terms of sec. 895.46(1) and went on to hold that, as a matter of law, the aldermen were acting beyond the scope of their employment when they acted contrary to the express order of the court.

*Bablitch & Bablitch v. Lincoln Co.*, 82 Wis. 2d 574, 263 N.W.2d 218 (1978), is the underpinning of the trial court decision. That case stands for the proposition that the statute, sec. 895.46(1), Stats. (then numbered sec. 270.-58), when it referred to "litigation," showed the legislature intended to impose liability upon a governmental unit for attorney fees and costs only in civil cases.

We need not review in the instant case whether this court's interpretation of "litigation" was correctly applied in *Bablitch* to exclude payment for attorney fees and costs in criminal cases, because the instant case is clearly civil in nature, both in respect to the underlying mandamus action and the contempt proceedings.

Sec. 783.01, Stats., provides, "Mandamus is a civil action." Sec. 783.04 provides, "If judgment be for the

plaintiff, the plaintiff shall recover damages and costs." It is thus clear from the face of the statutes that a mandamus action is a civil action which, in part at least, partakes of the characteristics of a civil action for damages. A contempt proceeding may be either for civil or criminal contempt. Although the time and circumstances at which or under which a contemptuous act was allegedly performed may affect a determination of whether the contempt is civil or criminal, our contempt statutes make it clear that the nature of the proceedings must be changed depending on whether a remedial sanction or a punitive sanction is contemplated by the court.

Sec. 785.01(2), Stats., states:

" 'Punitive sanction' means a sanction imposed to punish a past contempt of court for the purpose of upholding the authority of the court."

Sec. 785.01(3), Stats., provides:

" 'Remedial sanction' means a sanction imposed for the purpose of terminating a continuing contempt of court."

Sec. 785.04(1)(d), Stats., provides that a remedial sanction may be imposed to insure compliance with a prior order of the court.

The record clearly shows that it was the intent of Judge Grady, who presided at the contempt proceedings, that the sanction be of a remedial nature only; and, of course, had a punitive sanction been sought, a criminal procedure as outlined under sec. 785.03(1)(b), Stats., would have been required. As a prelude to a punitive sanction, the district attorney, the attorney general, or a special prosecutor appointed by the court would be required to issue a complaint and the matter would thereafter proceed under the criminal law as set forth in chs. 967–973, Stats. It is absolutely clear, then, that there was nothing in these proceedings which brought any of the conduct of the three aldermen within the rationale of

*Bablitch & Bablitch,* which held that it was not the intent of the legislature to furnish indemnification for attorney fees incurred in the defense of criminal proceedings. Both the mandamus action and the contempt proceedings were civil in nature.

The city has dragged a red herring across our jurisprudential path by asserting the relevancy of sec. 783.07, Stats.[2] That section provides that, when a public officer neglects to perform a duty enjoined by a writ of mandamus, the officer may be subject to a fine not to exceed $5,000 or imprisonment for a term not exceeding five years. The possible invocation of this statute came full blown from the city's counsel on this appeal. In none of the trial record is there the slightest intimation that, in the contempt proceeding, the judge was even considering the use of that statute. He was not interested in punitive sanctions but only remedial ones, which would insure that any contemnor, if contempt had actually been found, could have purged himself or herself of the contempt by compliance. He specifically disavowed the application of sec. 783.07, Stats. Furthermore, the case of *State ex rel. Bautz v. Harper*, 166 Wis. 303, 165 N.W. 281 (1917), leads to the conclusion that this statute, which first came into our laws in 1849, originated in an ancient parliamentary statute, 9 Anne, c. 20, and grew out of the common law remedy of action on the case in the event of a *false* return to a writ of mandamus. *See* discussion in *Bautz, supra* at 312. In any event, we find nothing in the anno-

---

[2] "783.07 **Fine or imprisonment.** Whenever a peremptory mandamus shall be directed to any public officer, body or board, commanding the performance of any public duty specially enjoined by law, if it shall appear to the court that such officer or any member of such body or board has, without just excuse, refused or neglected to perform the duty so enjoined the court may impose a fine, not exceeding $5,000, upon every such officer or member of such body or board, or sentence the officer or member to imprisonment for a term not exceeding 5 years."

tations to show that this statute has ever been utilized. Certainly its use was never contemplated in any of the present proceedings, and reference to it and reliance upon it by the city is inappropriate and has no support whatsoever in the record. Nothing in these proceedings cast an aura of criminality over any of the conduct of the three aldermen with whom we are concerned in this review.

The record shows that Judge Grady considered the "contempt" proceedings as part and parcel of the problem posed in the mandamus action. At the date of the initial return to the alternative writ, the city attorney appeared for the purpose of justifying, if possible, the actions of the aldermen on the ground that their failure to vote for the sewer connections was a discretionary act undertaken as part of their duties as legislators, was not ministerial, and therefore could not be compelled by mandamus.

Judge Grady made the finding, however, that their conduct was ministerial only and that the aldermen were not immunized from the writ of mandamus by virtue of the exercise of legislative discretion. After the peremptory writ issued, however, and the contempt order to show cause was issued, Judge Grady, apparently sensing the inadequacy of the city attorney's efforts to demonstrate at the earlier hearing that the aldermen's functions were legislative and not ministerial, decided, as a part of the contempt proceedings, that he would allow further evidence to be presented on that question. It is obvious, then, that in the contempt proceedings Judge Grady viewed the hearing as substantially a continuation of the exploration of the issues raised in the mandamus action. The second and final hearing, nominally on the matter of contempt, was devoted in the main to the question of whether the function of the aldermen in declining

to vote for the sewer extensions was ministerial or legislative.

All the attorney for Weissinger wanted was the passage of a resolution giving him the sewer extensions that his client desired, and all that Judge Grady wanted was a substantial compliance with the underlying writ of mandamus. Accordingly, it is apparent from a review of the record that criminality is simply not an issue. No criminal sanctions were ever contemplated. Moreover, no finding of contempt was ever definitively made; and to the extent that it was tentatively made or made in terms of a legal generalization, it was withdrawn by the contempt-proceeding judge almost immediately. Judge Grady, in the contempt proceedings, wisely reached the conclusion that the differences were reconcilable and accordingly suggested that there be a settlement. The upshot of this suggestion was the granting of the sewer extensions on conditions that were satisfactory to the dissenting aldermen, which resulted in the dismissal not only of the contempt proceedings but the underlying mandamus proceedings.

All of the proceedings, both as to the mandamus and alleged contempt, were handled by Judge Grady as civil actions. The *Bablitch & Bablitch* rule, which would deny compensation for attorney fees where a public officer seeks indemnification for fees necessary to defend a criminal action, is irrelevant.

We conclude that sec. 895.46(1), Stats., is designed, and was initially enacted, to provide indemnification to a public officer under the very circumstances of the instant case. Sec. 895.46(1) first came into the Wisconsin statutes by ch. 377 of the Laws of 1943. It was originally enacted as sec. 270.58 and provided:

"Where the defendant in any action, writ or special proceeding, except in actions for false arrest, is a public officer and is proceeded against in his official capacity

and the jury or the court finds that he acted in good faith the judgment as to damages and costs entered against the officer shall be paid by the state or political subdivision of which he is an officer."

That addition to the statutes, the records in the Legislative Reference Library demonstrate, arose from the then recent decisions of this court in *State ex rel. Lathers v. Smith*, 238 Wis. 291, 299 N.W. 43 (1941), and 242 Wis. 512, 8 N.W.2d 345 (1943). Those cases concerned a mandamus action brought by a highway contractor to compel Smith, the state treasurer, to honor an order of the state highway commission for the payment of certain extra work. A peremptory writ was entered, and it was this writ which Smith, the treasurer, appealed. It was found that the treasurer's duties were ministerial and not quasi-judicial and, accordingly, his conduct was amenable to the writ of mandamus. This court stated in the second *Lathers* case, where personal judgment was taken against him for damages and costs:

"This case is governed by the decision in the former appeal. The act of the appellant was determined not to be *quasi*-judicial in character, and although he was honest in his action, it was not within the scope of his authority. Under sec. 293.04, Stats., he is liable for damages and costs." 242 Wis. at 515.

In essentials, *Lathers v. Smith* is strikingly similar to the facts in the instant case. The writ was mandamus and the finding was that the conduct was ministerial only. It was because of the circumstances and holding in *Lathers*, similar to the circumstances in the present case, that the forerunner of sec. 895.46(1), Stats., was enacted in 1943.[3]

[3] We note in passing that Smith's appeal was from the peremptory writ. In the instant case no appeal was taken from the peremptory writ until after the initiation of the contempt proceedings. The record demonstrates, however, that the contempt pro-

The original purpose of the legislation following *Lathers* was to rectify a situation where a public official had acted outside his scope of authority but honestly. The statute, which was intended to rectify the holding of *Lathers,* imposed the requirement only that the officer be proceeded against in his official capacity and that he act in good faith. Because the finding of the court in *Lathers* was that Smith did not act within the scope of his authority and because the legislature in rectifying the holding in *Lathers* referred to "good faith" only, it is apparent that the legislature intended that "good faith" embrace the concept that a public officer who reasonably believed that he was acting within the scope of his authority was to be afforded protection.

Also, the statute as specifically enacted provided for protection of public officials in "any action, *writ* or special proceeding." (Emphasis supplied.) Here, in both the case of mandamus and the subsequent abortive contempt proceedings, the proceedings were commenced by what amounts to a writ—a true common law writ in the mandamus action and a quasi-writ, the order to show cause for contempt. There is nothing in the subsequent legislative history to show that proceedings against a

ceedings were brought within a few days of the issuance of the writ prior to the time that the right to appeal from the writ had run. The defendants could, of course, have asked for a stay; and, in fact, Alderman Carlson specifically suggested that there be a stay until such time as an appellate determination of the legality of the writ could be made. This suggestion fell on deaf ears as far as the city attorney was concerned. His response was merely that the aldermen were obliged to comply with the writ. We believe it comes with ill grace that the city, through its present attorney, should now assert that the appropriate remedy of the aldermen would have been to ask for a stay and then appeal, when the record clearly demonstrates that the city's official attorney, whose duty it was to represent the aldermen at the time, declined to give them legal assistance and specifically washed his hands of the dilemma which they, as nonlawyers, confronted.

public officer commenced by writ were not intended to continue to be included under the ambit of the statute.

The general trend of legislative modifications of the original statute demonstrates a legislative intention to broaden the protection afforded a public officer or employee. For example, ch. 576 of the Laws of 1957 included protection for town officers. Ch. 438 of the Laws of 1959 provided that reasonable attorney fees shall be paid by a political subdivision in false arrest cases. Deputy sheriffs who did not serve at the will of the sheriff were brought within the statute by ch. 499 of the Laws of 1961.

Chapter 603 of the Laws of 1966 amended the statute to provide reasonable attorney fees and costs for defending the action "[r]egardless of the results of the litigation . . . unless it is found by the court or jury that the defendant officer or employe did not act in good faith, when [the governmental unit] does not provide legal counsel to the defendant officer or employe." This 1966 amendment was at the instance of the Wisconsin State Employees Association, and the proposed amendment submitted to the bill drafting division of the Legislative Reference Library was drafted by the State Employees' representative, Attorney John Lawton. The only suggestion originally in the request for amendment was the provision to allow attorney fees and costs. The request also suggested, however, that it might be appropriate to "modernize language." Subsequent thereto, the bill drafting department struck from the existing legislation the word, "writ," and substituted in the proposed draft the word, "litigation," for the word, "action." The nature of these alterations would seem to indicate that the substitution of the word, "litigation," may not have been intended to have the substantive effect that was given to it by this court in *Bablitch & Bablitch.* It is clear, however, that "writ" is subsumed into language referring to actions,

and special proceedings are encompassed in the word, "litigation."

In 1973 the original language affording coverage to an employee when he "acted in good faith" was replaced by the language, "acting within the scope of his employment." Contrary to the assertions of the city, we cannot conclude that this change narrowed the coverage to be afforded to a state employee or officer. It is in fact a reference to the language of the second *Lathers* case; and we cannot conclude that the replacement language was intended by the legislature to offer less protection to an employee or officer than that afforded by "good faith."

Additional minor changes were made in 1975, 1976, and 1977. All these changes had the tendency to implement the legislature's intent to give added protection to public employees and officers.

Chapter 221, sec. 842, Laws of 1979, amended the statute to afford the state the opportunity to deny and contest the issue of its liability under this section and to require the cooperation of a defendant officer or employee. This last change appears to be the only narrowing of employee coverage following the initial passage of the basic statute in 1943.

The original sec. 270.58, Stats., was renumbered 895.45 in 1975 by the order of this court effective on January 1, 1976. That renumbering was altered by ch. 198 of the Laws of 1975 to the present statutory citation 895.46. The legislative chronology shows that the legislature has attempted to offer the broadest protection reasonably available to public officials and to public employees. The general spirit of the legislature's intent was recognized by this court in *Larson v. Lester*, 259 Wis. 440, 446, 49 N.W. 2d 414 (1951), when this court stated:

"It is our opinion that the language of sec. 270.58, Stats., is plain and unambiguous and requires no construction. The legislative history of this enactment dis-

closes that it was the intention of the legislature to make its scope as broad as possible, and it is our opinion that it did so when it covered defendants 'in *any* action, writ, or special proceeding.' "

This court has uniformly followed a broad interpretation of the protection afforded by this statute.

*Bablitch & Bablitch,* of course, clarified the applicability of the protection afforded where the underlying action is criminal in nature; and in the case before us, we have no occasion to question that interpretation. It is apparent that the intent of the statute—an intent which has been reiterated and amplified by the legislature—was to protect public officials who were proceeded against in their official capacities and who acted in good faith.

We conclude that the legislature intended that public officials, faced with the litigation of the nature of that in the present case, were to be afforded the right of indemnification from the governmental unit. It is clear that, if the aldermen were in the course of their employment—*i.e.,* were in good faith in their belief they were acting in their function as elected legislators of the city of Mequon—the city, under the provisions of sec. 895.46(1), Stats., is absolutely liable for the payment of any judgment against them for attorney fees and costs.

Sec. 895.46(1), Stats., provides that, in circumstances covered by that statute:

". . . the governmental unit, if it does not provide legal counsel . . . shall pay reasonable attorney fees and costs of defending the action, *unless it is found by the court or jury that the defendant officer or employe did not act within the scope of employment.*" (Emphasis supplied.)

This statutory mandate is consistent with the language of *Lester, supra* at 446, which pointed out that the ques-

tion of good faith is one for the court or jury to determine. It is also consistent with the recent case of *Cameron v. Milwaukee*, 102 Wis. 2d 448, 307 N.W.2d 164 (1981). We emphasize, however, that the assumption of the statute is that employees or officers are acting within the scope of their employment, and what is required of a trial court is a specific finding that they *did not act* within the scope of their employment. The circuit court which tried the instant action for attorney fees failed to make any finding in respect to the scope of employment and relied only upon the *Bablitch & Bablitch* rule that indemnity is not available in a criminal proceeding. As we have pointed out, the entire underlying course of action, both in respect to the mandamus and the contempt, was civil only. Hence, the rationale of the circuit court is inappropriate. The court of appeals attempted to satisfy the lacuna in the record by holding as a matter of law that the council members were not acting within the scope of their employment.

Because of the conflicting inferences which were recognized by Judge Grady in respect to whether or not during the course of these proceedings the aldermen were properly exercising their legislative discretion, a conclusion as a matter of law was inappropriate and beyond the jurisdiction of the court of appeals. Were we to reach a conclusion as a matter of law on the basis of the incomplete record in respect to the "scope of employment" and the "good faith" of the aldermen—and we believe the latter requirement on the basis of the legislative history is implicit in the question of whether public officials acted within the scope of their employment—we would be inclined to conclude that the aldermen were acting within the scope of their employment. However, it is no more within our jurisdiction to reach that conclusion as a question of law under the revealed facts than it was for the court of appeals. Essentially, the remaining

question is one of fact that must be determined by the finder of fact.

We point out that the record unmistakably shows that the dissenting aldermen were concerned about problems of health, safety, and pollution with respect to the disposal of raw sewage. These are police-power considerations which as a matter of law may very well override even vested contractual rights which, in the absence of police-power considerations, would relegate subsequent conduct of the aldermen to a ministerial function. In determining whether or not the aldermen acted within the scope of their employment when they refused to acquiesce to the writ of mandamus, it is necessary to make a finding of fact that they acted, or did not act, in the good faith belief that the health and welfare of the community motivated their conduct. If such be the case, then it should be clear to the finder of fact that throughout the proceedings their function was legislative and of a discretionary nature, which could not be compelled by a writ of mandamus. Absent a finding supported by the evidence that the aldermen were not within the scope of their employment, a final judgment in the mandamus proceedings and the subsequent contempt could well be deemed as an improper infringement by the judiciary upon the legislative function of a substantially autonomous governmental unit. It should be recalled, however, that Judge Grady in the contempt proceedings wisely recognized this delicate balance of power, and rather than to pursue the proceedings for contempt, he urged a settlement; and this settlement resulted in the dismissal of both the mandamus and the contempt proceedings. Hence, because the matter was reconciled to the apparent satisfaction of all parties, and agreed to by the mayor and entire common council, there was no intrusion upon the legislative function of the aldermen.

The aldermen nevertheless incurred substantial expenses in advocating their point of view and, arguably at

least, in defending their discretionary legislative functions under the police power. The fundamental issue in the instant lawsuit remains: Were the aldermen, in their conduct during the course of the contempt proceedings, which, by the determinations of Judge Grady were substantially merged with the mandamus proceedings, within the scope of their employment. Because this crucial determination was not made by the trial court, summary judgment was inappropriate. This question of controlling importance remained at issue. We accordingly reverse the decision of the court of appeals, vacate the summary judgment, and remand the cause to the trial court for the purpose of making the finding explicitly required by the statute that the defendants did not act within the scope of their employment, if the facts can support such a finding. If the circuit court cannot make such finding, it would appear that the aldermen have the right under the statute to be indemnified.[4]

There are, of course, other issues which may potentially arise. For example, the statute only allows "reasonable attorney fees." The city by this decision is not precluded from raising that and other issues that may emerge in the course of the litigation. Our holding is limited to the determination that the three aldermen who seek in-

---

[4] We recognize the procedural problem posed for the circuit court by the remand of this case. The mandamus and contempt actions presided over by Judge Grady were dismissed and are at an end. They cannot be revived. The circuit court which heard the summary judgment motion accordingly cannot rely even upon the tentative findings of Judge Grady. The necessary factual determinations in respect to "good faith" and "within the scope of employment" accordingly must be made *ab initio* by the circuit court (or jury), as must any other factual matters that may emerge. It would appear, however, transcripts of the testimony in both the mandamus and contempt actions, to the extent admissible, could be available to the court or jury to assist in the factfinding process. Findings in the prior proceedings cannot be used.

demnification are not precluded from that remedy by the nature of the proceedings which underlie their claim.

*By the Court.*—Decision of the Court of Appeals reversed and cause remanded to the Circuit Court, with directions for further proceedings.

CECI, J., took no part.