Merle C. ENGSBERG, Plaintiff,

v.

**TOWN OF MILFORD, David Vandre and Gilbert Schaefer, Defendants and Third-Party Plaintiffs,**

v.

**EMPLOYERS MUTUAL CASUALTY COMPANY, INC. and Tower Insurance Company, Inc., Third-Party Defendants.**

No. 84–C–259–S.

United States District Court,
W.D. Wisconsin.

Jan. 31, 1985.

See also 597 F.Supp. 251.

Terence S. Hawkins, Madison, Wis., for Engsberg.

Margaret Grabowski, Janesville, Wis., for Town of Milford and Vandre.

Stephen O. Murray, Madison, Wis., for Schaefer.

Barbara J. Swan, Madison, Wis., for Employers Mut.

James G. Allison, Milwaukee, Wis., for Tower Ins.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

Defendant Gilbert Schaefer moves for summary judgment in this action brought by plaintiff Merle C. Engsberg pursuant to 42 U.S.C. § 1983 for the alleged deprivation of rights secured him by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. The motion is granted.

Under Rule 56, Federal Rules of Civil Procedure, summary judgment is appropriate when, after the parties have had an opportunity to submit evidence in support of their respective positions and the Court has viewed such evidence in the light most favorable to the non-movant, there remains no genuine issue of material fact in the case. *Cedillo v. Int'l Ass'n of Bridge and Structural Iron Workers, et al.*, 603 F.2d 7, 9 (7th Cir.1979).

The Court finds the following as facts for the purpose of deciding Schaefer's motion:

### FACTS

1. Plaintiff Merle C. Engsberg is a resident of the Town of Milford, Wisconsin, and has been a resident of the town since 1947.

2. The defendant Town of Milford is a municipal corporation located in Jefferson County in Southeastern Wisconsin.

3. Defendant David B. Vandre was Town of Milford Constable at all times relevant to this action.

4. Vandre's duties as Town Constable were ill-defined at best and he received no formal training for the position. For a yearly stipend of approximately $35, he reported on law enforcement-type problems to the town board, kept a bridge on a road running through the town free of ice, and performed other miscellaneous duties on an irregular basis.

5. Defendant Gilbert Schaefer was an elected member of the Town of Milford Board holding the office of First Supervisor at all times relevant to this action.

6. Schaefer had also performed animal control duties for the town, capturing and impounding stray animals, and eventually destroying them, pursuant to Wis.Stat. § 174.046(9) (1981–82), if they were not picked up by their owners or adopted.

7. Sometime in March or early April 1982, plaintiff Engsberg, together with his 20 or so dogs, was evicted from a Town of Milford farm that his family had owned until 1971 and rented as sharecroppers thereafter.

8. After the eviction, Engsberg began living in a trailer on the farm of Dale Schultz, though he occasionally returned to his family's former homestead to sleep.

9. For a time, he housed his dogs in two horse trailers on the property of Harvey Weihert, for whom he sometimes worked as a farmhand. When that was no longer feasible, he transported 11 dogs to the Jefferson County Humane Society and received permission from Richard Krakow to keep five dogs in an unused granary on a farm that he owned within the general vicinity (two miles) of the former Engsberg farm and the Dale Schultz farm.

10. Sometime during the week of April 18, 1982, Engsberg transported five dogs to the granary on Krakow's property. The granary was one of four abandoned buildings on the farm; there was also another granary, a vacant farmhouse, and a shed. The windows of the granary had evidently been boarded up, and after putting the dogs inside, Engsberg nailed a half door across the entrance to the granary. He then closed a full door across the entrance and braced two or three posts against the outside of the door to secure the dogs inside. He did not padlock the door or otherwise secure it from outside interference. Besides the dogs, Engsberg stored nothing else within the granary, although he did park several vehicles belonging to him on the surrounding land.

11. During April 1982 Ronald Smith, who owned a farm adjacent to the Krakow property, was leasing and farming Krakow's land. [There is a factual dispute, however, about whether the lease included the abandoned buildings.]

12. On Saturday, April 24, 1982, Smith called First Supervisor Schaefer to complain that Dale Schultz's dogs had been running over his property and also that some other dogs had been penned in a barn on the property he was leasing from Richard Krakow. Schaefer told Smith that he was no longer handling dog complaints and that he should call the constable, Vandre. Smith called Vandre and told him of the dog problem, and Vandre promised he would come out to talk to Smith on Sunday the 25th. [There is a factual dispute about what Vandre did next; Vandre claims he called Schaefer Saturday evening or early Sunday morning and was told by Schaefer that he should shoot the dogs, but Schaefer denies having ever spoken with Vandre on the 24th or 25th, much less having told him to shoot the dogs.] On Sunday morning, Vandre called the Jefferson County Humane Society, but because the town had not contracted with the society to handle its animal control problems, the society would not respond to Smith's complaint.

13. On Sunday morning, Engsberg brought food and water to the dogs penned in the granary, as he had at least once a day during the previous three days.

14. Early in the afternoon on Sunday the 25th, Vandre went out to the Smith farm with one or two friends and found Smith spreading fertilizer on fields near the granary that held Engsberg's dogs. By this time, Vandre knew the dogs in the shed belonged to Engsberg; though he had never personally met Engsberg, he knew Engsberg was poor, was thought by folks in the area to be eccentric, and owned many dogs which at best had a not-unfounded reputation for unfriendliness.

15. Vandre approached Smith and discussed his complaint. Smith said he was worried about dogs running loose and harassing or possibly injuring his small children and his pigs. He stated that he wanted the dogs in the granary removed and the Schultzes spoken to about their dogs.

16. Vandre then approached the granary, ripped a board off a window, and peered inside. He states that he saw five German Shepherd breed dogs inside, who barked at him and bared their teeth. Empty food and water dishes were on the floor inside, but there was no sign of food and water. After looking for Engsberg in the vicinity of the granary without success, Vandre went to his car, pulled out a 30.06 rifle, and fired eight or so shots into the granary with the intention of killing all five dogs within; he believed that he had succeeded in doing so.

17. Vandre had never killed stray dogs within the Town of Milford prior to that occasion and has not done so since.

18. Immediately after shooting Engsberg's dogs, Vandre went with his friends to the Dale Schultz farm, where he noticed many small dogs running loose. He spoke to a woman there and told her that she should license and pen her dogs or take them to the humane society. He did not shoot the dogs on the Schultz farm.

19. Engsberg returned to the granary on Sunday evening only to discover that four of his five dogs were dead and the fifth was badly wounded. He brought the fifth dog to a veterinarian, who destroyed it.

20. Vandre returned to the granary on Tuesday, April 27, 1982, removed the bodies of the four dogs, and buried them on a friend's farm.

21. Engsberg eventually found out that it was Vandre who had killed his dogs, and after an investigation by the Jefferson County Sheriff's Department, Vandre was charged by the Jefferson County District Attorney with five counts of cruelty to animals contrary to Wis.Stats. §§ 948.02 and 948.18(1).

22. John Neupert, an attorney retained by the Town of Milford, made an initial determination that Vandre had been acting within the scope of his employment with the town in killing the Engsberg dogs. Thereafter, Neupert represented Vandre at the town's expense.

23. On February 7, 1983 Vandre plead guilty to one count of cruelty to animals pursuant to a plea bargain providing that he would pay Engsberg $625 as restitution for the dogs and be ordered to pay a fine

and court costs; Vandre fulfilled the plea bargain.

24. Subsequently, after a public hearing, the Town of Milford Board voted to reimburse Vandre for the property damage restitution and possibly for the fines and court costs as well.

## OPINION

In support of his motion for summary judgment, defendant Schaefer contends that the undisputed facts fail to support the conclusion that plaintiff Engsberg was deprived of any of his rights under the United States Constitution. Specifically, he argues that Engsberg's Fourth Amendment rights were not violated because Ronald Smith gave Vandre authority to enter the Krakow property and because Engsberg had no legitimate expectation of privacy in that property in the first place. Second, Schaefer asserts that Engsberg's claim under the equal protection clause of the Fourteenth Amendment is meritless because there is no evidence that Vandre had "an unjustifiable or prohibited motive." Finally, Schaefer urges the Court to find that Engsberg was not deprived of property without due process of law in derogation of the Fourteenth Amendment's due process clause because he had adequate post-deprivation remedies under state law. Plaintiff resists Schaefer's motion on every front, though he does not follow through on the allegation in his complaint that his rights under the Fifth Amendment were also violated.

### The Fourth Amendment Claim

■ The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The right protected by the Fourth Amendment is essentially a right to privacy; a person's ability to claim the protection of the Fourth Amendment depends not upon a property interest in the place invaded by government, but upon whether the person has a legitimate expectation of privacy in that place. *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967). The ultimate issue, then, "is wheth-

er one's claim to privacy from government intrusion is reasonable in light of all the surrounding circumstances." *Rakas v. Illinois*, 439 U.S. 128, 152, 99 S.Ct. 421, 435, 58 L.Ed.2d 387 (1978) (Powell, J., concurring).

■ The primary question presented here is whether Constable Vandre's warrantless partial entrance into the Krakow granary to shoot Engsberg's dogs was an unreasonable search that violated the Fourth Amendment. First, Vandre's actions undoubtedly constituted a search for Fourth Amendment purposes; it is not as if he fired randomly into the granary from the outside without knowing who or what was in it. Second, since Vandre's search was warrantless, there is a presumption that it was unreasonable. *United States v. Dunn*, 674 F.2d 1093 (5th Cir.1982). That presumption can be overcome, however, if the search occurred with the valid consent of Engsberg or a third party having authority or apparent authority to consent to a search of the premises, *United States v. Sellers*, 667 F.2d 1123 (4th Cir.1981), or if under the circumstances Engsberg could have no legitimate expectation of privacy in the premises searched, *United States v. Thornley*, 707 F.2d 622, 624 (1st Cir.1983). The Court concludes both that Vandre was given consent to search the granary and that Engsberg could have no legitimate expectation of privacy there.

■ With respect to the consent issue, it is undisputed that farmer Ronald Smith had leased the land on which the granary and the other buildings on the Krakow farm stood from Richard Krakow himself. Although it must be assumed for the purposes of this motion that Smith's lease did not include those buildings, the record reveals that those buildings had been abandoned for all practical purposes and that the granary itself had been unused prior to Engsberg storing his dogs there. Engsberg himself apparently had no knowledge whether the granary was being used for other purposes. Thus, it was not unreasonable for Smith to have believed that he had dominion over and/or

access to the buildings as well as the land. As the court stated in *Sellers,*

Valid third-party consent to a search may be given by one who shares with the absent target of the search a common authority over, general access to, or mutual use of the place of object sought to be inspected under circumstances that make it reasonable to believe the third person has the right to permit the inspection in his own right and that the absent target has assumed the risk that the third person may grant this permission to others.

*United States v. Sellers,* 667 F.2d at 1126 (citations omitted).

■ Moreover, when Smith initially called Vandre, he told him, as he had told Schaefer, that he was renting the land on which the building with the dogs was located, and when Vandre arrived on the scene, Smith was spreading fertilizer on the Krakow property and explicitly gave Vandre permission to enter whichever of the buildings contained the dogs. Thus, even if it can be inferred from the facts before the Court that Smith did not in fact have the authority to consent to Vandre's search of the granary, it is clear that he had the apparent authority to so consent. Consent coupled with apparent authority over the premises is sufficient to make an officer's warrantless search reasonable. See *United States v. Sledge,* 650 F.2d 1075, 1081 (9th Cir.1981) and cases cited therein.

With respect to the privacy issue, the situation here is similar in broad outline to that faced by the court in *United States v. Thornley, supra.* There, the defendant had placed certain belongings in the basement storage area of an apartment building owned by a friend. The storage area was used in common with building tenants, although the defendant himself was not a tenant of the building. In response to information furnished by a tenant, police searched the storage area and found the defendant's property, which was incriminating. Applying the two-part test of *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), the court of appeals found that although the defendant undoubtedly had a subjective expectation of privacy, that expectation could not have been objectively reasonable given the fact that all building tenants had access to the storage room, the door from the basement to the area was always unlocked, and the defendant himself did not live in the building. Accordingly, the court upheld the admission of the incriminating evidence in a criminal prosecution of the defendant.

■ Here, it is not even clear that Engsberg had a subjective expectation of privacy, much less an objective expectation. On April 25, 1982, no one was living on the Krakow farm, and the granary was simply one of four abandoned buildings on the property. In giving Engsberg permission to use the granary, owner Krakow never guaranteed that Engsberg would have exclusive use of the granary and in fact had leased the land on which the buildings stood to Ronald Smith. Furthermore, Engsberg was not asked to pay rent for the building, nor did he do so. Finally, it is evident from the precautions that Engsberg took in securing the granary that he was more concerned with keeping the dogs penned inside than in keeping other persons out. In these circumstances, Engsberg could not be found to have a legitimate expectation of privacy in the granary. Thus, Vandre's search of the granary did not violate Engsberg's Fourth Amendment rights.

The only remaining Fourth Amendment issue is whether any seizure that took place was unreasonable. Engsberg contends, without citing authority, that the destruction of his dogs was an unreasonable seizure by Vandre; the Court cannot agree with that assertion and finds that the only arguable seizure in this case took place when Vandre removed the dogs to bury them on April 27, 1982.

■ If a person has no legitimate expectation of privacy in a place from which his or her property was "seized" by the government, then the seizure was not unreasonable, although the person may have standing to recover the property on other grounds. *See Hudson v. Palmer,* —— U.S. ——, 104 S.Ct. 3194, 3201, 82 L.Ed.2d 393

(1984); *United States v. Lisk,* 522 F.2d 228, 230 (7th Cir.1975). *Cf. United States v. Ziperstein,* 601 F.2d 281, 289 (7th Cir.1979) *cert. den.* 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (court upheld trial court's admission of records taken from defendant's business by employee on the ground that the defendant had no reasonable expectation that employee would not have access to the records).

As held above, Engsberg had no legitimate expectation of privacy in the Krakow granary and consequently any seizure of property from the granary was not unreasonable. Moreover, even if the Court were to adopt language from one line of cases apparently suggesting that the Fourth Amendment protects possessory interests independent of any right to privacy, *see Hudson v. Palmer, supra,* 104 S.Ct. at 3206 (O'Connor, J., concurring), the circumstances in which the particular seizure at issue here occurred demonstrate that it was reasonable. At the outset, Smith, the apparent leasee of the property, had asked that the dogs be removed. Then, Vandre had initially concluded, no matter how reasonably or unreasonably, that the dogs had been abandoned in the shed. In spite of the fact that one of the dogs had been removed when he returned to the shed two days after the shooting, the fact that the bodies of the four dead dogs remained in the shed would merely have reinforced his initial conclusion. If he had not then seized the dogs' bodies, the information available to him at the time would have led him to believe that the bodies would rot where they lay. Certainly, their removal was justified by a myriad of public health and other legitimate concerns.

*The Equal Protection Claim*

In his brief in opposition to summary judgment, plaintiff Engsberg states that his equal protection claim is more specifically a claim alleging selective prosecution based on personal animus. Engsberg contends that "personal animus" can be inferred from the fact that Vandre did not kill the Schultz dogs that Ronald Smith had also complained about, and from Vandre's knowledge of Engsberg's poverty and of his reputation as an eccentric.

The Fourteenth Amendment states, "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." "The guarantee of equal protection ... is not a source of substantive rights or liberties, but rather a right to be free from invidious discrimination in statutory classifications and other government activity." *Harris v. McRae,* 448 U.S. 297, 322, 100 S.Ct. 2671, 2690–91, 65 L.Ed.2d 784 (1979). The government activity that falls within that command includes the passage of statutes with differing impact on discrete classes of individuals, *Columbia Board of Education v. Penick,* 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979), as well as the actions of state employees in administering or enforcing statutes, *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). The invidious discrimination that is prohibited by the clause is intentional discrimination between classes of persons on a basis insufficiently related to legitimate governmental objectives. *Village of Arlington Heights v. Metro Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 458 (1977); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1975).

There are several reasons why the facts brought to light so far are insufficient to support an equal protection claim. First, they do not show that Vandre or Schaefer or the town discriminated against Engsberg in the way they treated his dogs; Engsberg has not demonstrated how his dogs were treated differently than anyone else's dogs in a similar situation. The episode with the Schultz dogs that Engsberg cites as evidence of discriminatory treatment is hardly probative on the issue of discrimination because it is so factually dissimilar. The Schultz dogs were relatively small, their apparent owner was present, they were not penned up without sign of food and water, and they were by all accounts friendly.

■ Likewise, although it is usually difficult at the summary judgment stage to make factual determinations about motivation, there is not a shred of evidence to support the suggested inference that Vandre acted as he did because Engsberg was poor and eccentric. Rather, the undisputed facts overwhelmingly support the inference that Vandre acted as he did because he did not know any better given the situation as he saw it. Even if he had been ordered to kill the dogs, a fact in dispute, there is no evidence that such an order was motivated by invidious reasoning abhorrent to the equal protection clause; government decisions not involving invidious discrimination against discrete classes of individuals, even if arbitrary, do not fall within the prohibition of that clause. *See Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir.1982).

### The Due Process Claim

Plaintiff Engsberg last contends that Vandre's actions violated his Fourteenth Amendment rights to both substantive and procedural due process.

■ Engsberg cites *Jackson v. City of Joliet*, 715 F.2d 1200 (7th Cir.1983) and *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979) for the proposition that deliberate official misconduct shocking the conscience, with or without an invasion of personal security, violates that less-than-clear constitutional right known as the right to substantive due process. He then argues that Vandre's conduct shocks the conscience and amounted to an invasion of his personal security because it led to emotional distress manifested in a fear that he, Engsberg, could be killed with impunity.

Seldom has such a patently absurd argument been made to this Court. The destruction of Engsberg's dogs is undoubtedly lamentable, yet in a world where horrific crimes are committed daily, populations of whole continents cannot speak their minds without justified fear of imprisonment, and millions go to bed hungry, whatever the character of Vandre's conduct, it hardly shocks the conscience. Furthermore, if every tort that led to a fear for personal safety were the equivalent of an invasion of personal security, few torts would not invade personal security.

■ Regarding Engsberg's procedural due process claim, the Court must conclude that it fails under the holding of *Hudson v. Palmer*, —— U.S. ——, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). In essence, Engsberg's procedural due process clause is that Vandre, acting in his official capacity as Town of Milford Constable, deprived him of property by intentionally destroying his dogs, either maliciously or as a result of poor judgment. Because Vandre did not give Engsberg an opportunity to claim his dogs and acted in contravention of state law regarding government destruction of animals, the deprivation is argued to have been without due process.

Plaintiff Engsberg is correct in his assertion that *Hudson* and its progenitor, *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), stand for the proposition that a deprivation of property is not "without due process" if (1) a predeprivation hearing was impracticable; (2) the deprivation was random and unauthorized; and (3) state postdeprivation remedies for the property loss are adequate.

All three criteria are met here. From the perspective of the Town of Milford, the government body whose power Vandre was purportedly exercising, a predeprivation hearing was impossible because the town board as a whole learned of Vandre's conduct only after he had shot the dogs. Second, Vandre's conduct was random and unauthorized in that the town had no policy in favor of shooting dogs without complying with state law and the town board in fact had not authorized Vandre's conduct. Nor did it condone that conduct after the fact through its decision to reimburse Vandre for his fines and the money paid to Engsberg in restitution. The decision to reimburse Vandre was justified under state law, as Vandre apparently had a good faith belief that he had acted within the scope of his employment. *See* Wis.Stat. § 895.46 (1981–82) and *Schroeder et al. v. Schoessow*, 108 Wis.2d 49, 321 N.W.2d 131 (1982).

Finally, as the Seventh Circuit Court of Appeals held in *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 871 (7th Cir.1983), to the extent Vandre's intentional conduct was merely negligent, there are adequate tort remedies under Wis.Stat. § 893.80 for unintentional torts committed by employees of local government. If Vandre's conduct was an intentional tort, there is no bar under Wisconsin law to direct suit against him. State postdeprivation remedies as a whole, therefore, are adequate.

One final note. Although defendants Vandre and the Town of Milford did not move for summary judgment, the legal grounds upon which the Court concludes that Engsberg's constitutional rights were not violated apply equally to them and moving defendant Schaefer. Engsberg's § 1983 action will consequently be dismissed with respect to all parties.

Accordingly,

## ORDER

IT IS ORDERED that the motion of defendant Gilbert Schaefer for summary judgment on the § 1983 claim of plaintiff Merle Engsberg is GRANTED.

IT IS FURTHER ORDERED that the complaint of plaintiff Merle C. Engsberg against defendants David B. Vandre, the Town of Milford, and Gilbert Schaefer is hereby DISMISSED, with prejudice as to the federal claims, and that judgment be entered in favor of those defendants.